**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| KESHA GIBSON-CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| RAPE CRISIS CENTER, | ) | |
| GILBERT BALLARD, | ) | |
| CHERYL BRANCH, | ) | |
| HEATHER BOOTH, | ) | |
| ROBERT BRYSON, | ) | |
| DEENA CAMACHO, | ) | Case No. |
| SANDRA CLARK, | ) | |
| PAT DOUGLAS, | ) | |
| KIMBERLY FRITZ-TANNER, | ) | JURY TRIAL DEMANDED |
| WENDY FUREY, | ) | |
| ROSE GRANT-ROBINSON, | ) | |
| MEG HEAP, | ) | |
| JOSEPH HOGAN, | ) | |
| MIKE HUGHES, | ) | |
| A. BLAIR JEFFCOAT, | ) | |
| KATIE JOYNER-BARBER, | ) | |
| MATT LIBBY, | ) | |
| JOSEPH LUMPKIN, | ) | |
| BRETT LUNDY, | ) | |
| MARK MERRIMAN, | ) | |
| MARK REVENEW, | ) | |
| MARY ROBERTS, | ) | |
| CHERYL ROGERS, | ) | |
| KEVIN SHEA, and | ) | |
| LYNNE WOLF. | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Plaintiff Kesha Gibson-Carter files this Complaint against Defendants to recover

all permissible damages under controlling law for violation of Ms. Gibson-Carter's

rights pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq and

42 U.S.C. § 1981), 42 U.S.C. § 1983, and 42 U.S.C. § 1985(3) and all other applicable laws.

## INTRODUCTION

The Rape Crisis Center (RCC) Board members and its Savannah Community

Partners (SCP) and the Criminal Justice Coordinating Council (CJCC) conspired to get

rid of Ms. Gibson-Carter after she made public statements that law enforcement entities

in the surrounding community were not doing their due diligence in investigative work

or subsequent arrests and prosecution of sexual assault offenders. For speaking out as

an advocate and on behalf of victims of rape, in her capacity as Executive Director of the

RCC, the RCC Board members and the SCP sacrificed her, silencing her critically

necessary voice from a conversation that has weight for not only the sexual assault

victims in the Savannah community, but for our country's community at large.

Prior to her public statements alluding to deficiencies in the Chatham County

District Attorney's office, the RCC Board never expressed any issues with Ms. Gibson-

Carter's performance as Executive Director; when the SCP sent a letter to the RCC

complaining of dissatisfaction, it tipped the first domino in a fall that resulted in the end

of Ms. Gibson-Carter's career. Assisting the velocity of her fall were the numerous false

accusations against her by the RCC Board and the SCP, false statements to the press,

and racist behavior from Board members and community partners, a large majority of

whom are white. In fact, at least one Board member admitted that attack was 'racial.' In

support of the retaliation and conspiracy against Ms. Gibson-Carter as a result of her

statements, Board members released privileged and false information to the Savannah

Morning News and other high-profile individuals, leading to false and defamatory allegations, emotional distress, loss of income, humiliation, and other indignities.

This was a collective conspiracy—**instigated and led by the government**-- against Ms. Gibson-Carter in retaliation for being an African American woman in a position of power and for leveraging that position to engage her First Amendment rights, speaking truth in order to educate the community about the realistic status of the diligence surrounding the prosecution of sexual assault offenders. The ring leader was Defendant Meg Heap, Chatman County District Attorney, who stepped out of her prosecutorial role, to pressure other Defendants to collude in firing Ms. Gibson-Carter, who was Ms. Heap's public critic. If the Executive Director of the Rape Crisis Center is not permitted to be the public voice for sexual assault victims, who is permitted to? Who should be?

## <u>JURISDICTION AND VENUE</u>

1.

Jurisdiction is proper under 28 U.S.C. § 1331 and 1343(a)(4), as well as under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq), and pursuant to 42 U.S.C. § 1981, 42 U.S.C. § 1983, and 42 U.S.C. § 1985(3). This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201 and 2202. This Court may also grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure. This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988. Venue is proper under 28 U.S.C. § 1391(b) and L.R. 2.1(b) because (1) a substantial part of the events and omissions giving rise to Ms. Gibson-

Carter's claims occurred within this District and Division and (2) Defendants reside and transact business in this District and Division.

## ADMINISTRATIVE PROCEEDINGS

2.

Ms. Gibson-Carter filed a Charge of Discrimination with the Equal Employment Opportunity Commission on June 27, 2018 – within 180 days of the occurrence of the discrimination and the RCC's termination of her employment.

3.

Plaintiff received her Notice of Right to Sue on March 5, 2019 and instituted this civil action in the appropriate federal district court within 90 days of the receipt of the Notice of Right to Sue.

## PARTIES

4.

At all times relevant to this Complaint, Plaintiff Kesha Gibson-Carter was a citizen of the United States and a resident of Georgia. Ms. Gibson-Carter worked as an Executive Director for the Rape Crisis Center in Savannah, Georgia from 2013 until June 2018. At all times relevant to this Complaint, Ms. Gibson-Carter had clearly established legal rights under state and federal law and the United States Constitution. Ms. Gibson-Carter submits herself to the jurisdiction and venue of this Court and is entitled to bring this action under state and federal law for all general, special, compensatory, punitive, and any other permissible damages.

5.

At all times relevant to this Complaint, Defendant Rape Crisis Center of the
Coastal Empire served Chatham, Bryan, Effingham, Liberty, Evans, Long and Tattnall
counties. The RCC is funded by the city of Savannah, Chatham County, United Way of
the Coastal Empire, and Georgia's Criminal Justice Coordinating Council.

6.

At all times relevant to this Complaint, Defendant A. Blair Jeffcoat was a United
States Citizen, a Georgia resident, and Chief for the Bloomingdale Police Department.
At all times relevant, Jeffcoat was subject to the laws of the State of Georgia and the
Constitution of the United States. Mr. Jeffcoat is a Caucasian male, at a signature on the
January letter at issue in this Complaint.

7.

At all times relevant to this Complaint, Defendant Brett Lundy was a United
States Citizen, a Georgia resident, an Engineer at Thomas & Hutton, and a Board
Member of the RCC. At all times relevant, Lundy was subject to the laws of the State of
Georgia and the Constitution of the United States. Mr. Lundy is a Caucasian male.

8.

At all times relevant to this Complaint, Defendant Cheryl Branch was a United
States Citizen, a Georgia resident, and Executive Director of the SAFE Shelter, Center
for Domestic Violence. At all times relevant, Branch was subject to the laws of the State
of Georgia and the Constitution of the United States. Ms. Branch is a Caucasian female
and a signature on the January Letter at issue in this Complaint.

9.

At all times relevant to this Complaint, Defendant Cheryl Rogers was a United States Citizen, a Georgia resident, and Director of the Victim-Witness Assistance Program. At all times relevant, Ms. Rogers was subject to the laws of the State of Georgia and the Constitution of the United States. Ms. Rogers is a Caucasian female and a signature on the January Letter at issue in this Complaint.

10.

At all times relevant to this Complaint, Defendant Deena Camacho was a United States Citizen, a Georgia resident, a realtor at Southbridge Greater Savannah Reality, and Board member of the RCC. At all times relevant, Camacho was subject to the laws of the State of Georgia and the Constitution of the United States. Ms. Camacho is a Caucasian female.

11.

At all times relevant to this Complaint, Defendant Joseph Hogan was a United States Citizen, a Georgia resident, a Physician at Memorial University Medical Center, and Board member of the RCC. At all times relevant, Hogan was subject to the laws of the State of Georgia and the Constitution of the United States. Mr. Hogan is a Caucasian male.

12.

At all times relevant to this Complaint, Defendant Gilbert Ballard was a United States Citizen, a Georgia resident, and Chief for the Garden City Police Department. At all times relevant, Ballard was subject to the laws of the State of Georgia and the

Constitution of the United States. Mr. Ballard is a Caucasian male and a signature on the January Letter at issue in this Complaint.

13.

At all times relevant to this Complaint, Defendant Heather Booth was a United States Citizen, a Georgia resident, a realtor at Cora Bett Thomas, and Board member of the RCC until late March 2018, when she resigned. At all times relevant, Booth was subject to the laws of the State of Georgia and the Constitution of the United States. Ms. Booth is a Caucasian female.

14.

At all times relevant to this Complaint, Defendant Joseph Lumpkin was a United States Citizen, a Georgia resident, and Chief for the Savannah Chatham Metropolitan Police Department. At all times relevant, Lumpkin was subject to the laws of the State of Georgia and the Constitution of the United States. Mr. Lumpkin is an African American male and a signature on the January Letter at issue in this Complaint.

15.

At all times relevant to this Complaint, Defendant Katie Joyner-Barber was a United States Citizen, a Georgia resident, Agent at Rountree Brady Insurance, and Board Member of the RCC. At all times relevant, Joyner-Barber was subject to the laws of the State of Georgia and the Constitution of the United States. Ms. Joyner-Barber is a Caucasian female.

16.

At all times relevant to this Complaint, Defendant Kevin Shea was a United States Citizen, a Georgia resident, Project Engineer at Advanced Flight Deck Programs Gulfstream, and Board member of the RCC. At all times relevant, Shea was subject to the laws of the State of Georgia and the Constitution of the United States. Mr. Shea is a Caucasian male.

17.

At all times relevant to this Complaint, Defendant Kimberly Fritz-Tanner was a United States Citizen, a Georgia resident, a Senior Director of Development and Management at the United Way of the Coastal Empire, and Board member of the RCC. At all times relevant, Fritz-Tanner was subject to the laws of the State of Georgia and the Constitution of the United States. Ms. Fritz-Tanner is a Caucasian female.

18.

At all times relevant to this Complaint, Defendant Lynne Wolf was a United States Citizen, a Georgia resident, a Regulatory Compliance Officer at Memorial University Medical Center, and Board member of the RCC. At all times relevant, Wolf was subject to the laws of the State of Georgia and the Constitution of the United States. Ms. Wolf is a Caucasian female.

19.

At all times relevant to this Complaint, Defendant Matt Libby was a United States Citizen, a Georgia resident, and Chief for Port Wentworth Police Department. At all times relevant, Libby was subject to the laws of the State of Georgia and the Constitution of the United States. Mr. Libby is a Caucasian male and a signature on the January Letter at issue in this Complaint.

20.

At all times relevant to this Complaint, Defendant Mark Revenew was a United States Citizen, a Georgia resident, and Chief for Pooler Police Department. At all times relevant, Revenew was subject to the laws of the State of Georgia and the Constitution of the United States. Mr. Revenew is a Caucasian male and a signature on the January Letter at issue in this Complaint.

21.

At all times relevant to this Complaint, Defendant Mary Roberts was a United States Citizen, a Georgia resident, a Valuations and Transactions Advisor at Hancock Askew Valuation Services, LLC and Board member of the RCC. At all times relevant, Ms. Roberts was subject to the laws of the State of Georgia and the Constitution of the United States.

22.

At all times relevant to this Complaint, Defendant Meg Heap was a United States Citizen, a Georgia resident, and District Attorney for the Eastern Judicial Circuit. At all times relevant, Heap was subject to the laws of the State of Georgia and the Constitution of the United States. Ms. Heap is a Caucasian female and a signature on the January Letter at issue in this Complaint.

23.

At all times relevant to this Complaint, Defendant Mike Hughes was a United States Citizen, a Georgia resident, an Engineer at Thomas & Hutton, and Board member of the RCC. At all times relevant, Hughes was subject to the laws of the State of Georgia and the Constitution of the United States. Mr. Hughes is a Caucasian male.

24.

At all times relevant to this Complaint, Defendant Pat Douglas was a United States Citizen, a Georgia resident, a CPA at P.F. Douglas, LLC and Board member of the RCC. At all times relevant, Douglas was subject to the laws of the State of Georgia and the Constitution of the United States. Mr. Douglas is a Caucasian male.

25.

At all times relevant to this Complaint, Defendant Robert Bryson was a United States Citizen, a Georgia resident, and Chief for Tybee Island Police Department. At all times relevant, Bryson was subject to the laws of the State of Georgia and the Constitution of the United States. Mr. Bryson is a Caucasian male and a signature on the January Letter at issue in this Complaint.

26.

At all times relevant to this Complaint, Defendant Rose Grant-Robinson was a United States Citizen, a Georgia resident, and works for the Coastal-Children's Advocacy Center. At all times relevant, Grant-Robinson was subject to the laws of the State of Georgia and the Constitution of the United States. Ms. Grant-Robinson is an African American female and a signature on the January Letter at issue in this Complaint.

27.

At all times relevant to this Complaint, Defendant Mark Merriman was a United States Citizen, a Georgia resident, and Chief for the Thunderbolt Police Department. At all times relevant, Merriman was subject to the laws of the State of Georgia and the Constitution of the United States. Mr. Merriman is a Caucasian male and a signature on the January Letter at issue in this Complaint.

28.

At all times relevant to this Complaint, Defendant Sandra Clark was a United States Citizen, a Georgia resident, a retired Educator, and Board member of the RCC. At all times relevant, Clark was subject to the laws of the State of Georgia and the Constitution of the United States. Ms. Clark is an African American female.

29.

At all times relevant to this Complaint, Defendant Wendy Furey was a United

States Citizen, a Georgia resident, and Special Assistant Attorney General for Chatham

Co. Department of Family and Children Services. At all times relevant, Ms. Furey was

subject to the laws of the State of Georgia and the Constitution of the United States. Ms.

Furey is a Caucasian female and a signature on the January Letter at issue in this

Complaint.

## STATEMENT OF FACTS

### I.  Savannah Community Partners send a letter to the RCC complaining of dissatisfaction

30.

At a December 2017 Savannah City Council meeting, Ms. Gibson-Carter publicly

expressed her concerns about deficiencies in the Chatham County District Attorney's

Office and its law enforcement affiliates' arrest, prosecution, and conviction rates of

sexual assault offenders; these statements invoked the RCC's law enforcement and

community partners represented in this Complaint by Defendants Joseph Lumpkin,

Gilbert Ballard, Matt Libby, Robert Bryson, Cheryl Branch, Rose Grant-Robinson,

Robert Merriman, A. Blair Jeffcoat, Mark Revenew, Meg Heap, Wendy Furey, and

Cheryl Rogers.

31.

Defendant Joseph Lumpkin was present at the 2017 Savannah City Council

meeting in which Ms. Gibson-Carter spoke.

32.

Upon information and belief, Defendant Lumpkin, along with Defendant Meg Heap (District Attorney), decided that action needed to be taken against Ms. Carter for exercising her First Amendment rights.

33.

After making her statements at said Savannah City Council meeting, Defendant Meg Heap (District Attorney) sat down with Ms. Gibson-Carter and communicated that she could be charged with a misdemeanor for neglecting to redact a child's name from an email when checking on the child's welfare in August 2017 (4 months prior); this issue was never brought up by Defendant Meg Heap until after Ms. Gibson-Carter publicly stated her concerns about the deficiencies the Chatham County District Attorney's office.

34.

In an open meeting between Defendant RCC and law enforcement, Defendant Meg Heap's staff member, ADA Jenny Parker, publicly uttered the same sentiments related to the alleged misdemeanor; this meeting was recorded without Ms. Gibson-Carter's knowledge.

35.

In a later Savannah City Council meeting in December 2017, Ms. Gibson-Carter publicly remarked that Defendant Meg Heap, ADA Jenny Parker, and the District Attorney Office's reaction to her comments at the last City Council meeting was "workplace bullying at its finest." Ms. Gibson-Carter publicly stated, "I won't give up, let up or stop or keep quiet."

36.

All Savannah City Council meetings are live-streamed and can be accessed by the public and news outlets at any time through Savannah Government Television.

37.

One month after Ms. Gibson-Carter's public statements, in January 2018, a collection of Savannah Community Partners (SCP) delivered a letter to the RCC Board of Directors complaining that "important community relationships have become unnecessarily strained and less than productive."

38.

The letter from the SCP Defendants to the RCC Defendants complained of dissatisfaction but did not provide specifics as to any of the perceived challenges or suggestions on how to solve them; rather, the SCP requested time to speak with the entire RCC Board.

39.

The letter was signed by Savannah Community Partners and Defendants Joseph Lumpkin, Chief, Savannah Chatham Metropolitan Police Department; Gilbert Ballard, Chief, Garden City Police Department; Matt Libby, Chief, Port Wentworth Police Department; Robert Bryson, Chief, Tybee Island Police Department; Cheryl Branch, Executive Director of SAFE Shelter, Center for Domestic Violence; Rose Grant-Robinson, Coastal Children's Advocacy Center; Robert Merriman, Thunderbolt Police Department; A. Blair Jeffcoat, Chief, Bloomingdale Police Department; Mark Revenew, Chief, Pooler Police Department; Meg Heap, District Attorney of the Eastern Judicial District; Wendy Furey, Special Assistant Attorney General of the Chatham Co. Department of Family and Children's Services; and Cheryl Rogers, Director of the Victim-Witness Assistance Program. **Out of these twelve individuals, ten are Caucasian**.

40.

Savannah-Chatham County Public School System Chief Terry Enoch and Savannah State Police Chief James Barnwell were not asked to sign the SCP's January letter of concern, despite the fact that Ms. Gibson-Carter had more cases with the Board of Education and Savannah State University than many of the law enforcement agencies who signed the January letter; both Enoch and Barnwell are African American.

41.

Prior to Ms. Gibson-Carter's December 2017 statements at the two City Council meetings, the SCP never collectively communicated any concerns about Ms. Gibson-Carter to the RCC Board.

## II. Savannah Community Partners meet with the Board of the RCC and demand Ms. Gibson-Carter's removal as Executive Director

42.

Pursuant to the meeting requested in the January letter, the SCP met with the RCC Board in February 2018 and requested the removal of Ms. Gibson-Carter as the Executive Director.

43.

Said meeting between the RCC Board and the SCP was hosted at Thomas & Hutton Engineering.

44.

Thomas & Hutton Engineering is a firm in Savannah heavily supported by the Mayor in Savannah and Alderwoman Carol Bell.

45.

Upon information and belief, the Mayor and Alderwoman Carol Bell had a vested interested in silencing Ms. Gibson-Carter because of her public statements on deficiencies in the state of Georgia's and the City of Savannah's arrest, prosecution, and conviction rates of sexual assault offenders.

46.

Two members of the RCC Board, Mike Hughes and Brett Lundy, work for Thomas & Hutton, the firm heavily supported by the Mayor and Alderwoman Carol Bell who, upon information and belief, had a vested interested in silencing Ms. Gibson-Carter.

47.

Alderwomen Carol Bell attends church with the Dorris Williams, the woman who replaced Ms. Gibson-Carter as Executive Director upon her termination.

48.

At said meeting between RCC Board members and the SCP, the SCP provided additional context to their letter by presenting the Board with a binder containing 25+ issues dating back to 2013 and a recording of a phone call between Sergeant Emily Manual and Ms. Gibson-Carter. Ms. Gibson-Carter was not informed that the phone call was being recorded and Ms. Manual can be heard being particularly antagonistic.

49.

Included in said binder was the allegation that Ms. Gibson-Carter altered the SART Sexual Assault Protocol to dictate that Sexual Assault Nurse Examiners (SANEs) would perform sexual assault examinations on prepubescent victims.

50.

Said protocol change happened in December 2016, one year before Ms. Gibson-Carter's statements and the SCP's January 2017 letter of concern.

51.

Prior to the SCP coming forward with their complaints against Ms. Gibson-Carter, at least one Board member, Defendant Jeff Hogan, was fully aware of the changes in SART's Sexual Assault Protocol; as a physician at Memorial University Medical Center, Mr. Hogan **supported and encouraged Ms. Gibson-Carter and the changes in protocol,** attending meetings with his staff and colleagues from the Emergency Department to discuss and establish protocol for said updates.

52.

Despite the demonstrably false allegations that Ms. Gibson-Carter "unilaterally" changed the protocol, it is true that 1) SANEs were already performing examinations of prepubescent victims prior to Ms. Gibson-Carter's recommendations for revision to the protocol 2) Ms. Gibson-Carter proposed a revision during the comment period for the 2017 SART protocol, 3) these changes had already been proposed by other individuals including Sergeant Tiffany Manual of Savannah Metro and RCC SANE's and Victim Advocate Laura Weatherly and 4) the very protocol she was accused of changing was reinstituted after her termination.

53.

Prior to the SCP coming forward with their complaints against Ms. Gibson-Carter, the Board **never** admonished Ms. Gibson-Carter for her suggestions of revising the SART's Sexual Assault Protocol.

54.

Included in the binder of complaints about Ms. Gibson-Carter was an issue with an RCC employee's interview with a victim, in which the employee was accused of making disparaging comments against SVU Detectives; Defendant Lumpkin brought this issue to Ms. Gibson-Carter's attention via email on December 8, 2017, just before her appearance at the City Council meeting.

55.

Ms. Gibson-Carter met with the employee at issue in paragraph 53 to inquire about what happened and spoke with the victim, who stated that the RCC employee did nothing wrong and that had it not been for her, the victim would not have made it through the interview. Unbeknown to Ms. Gibson-Carter, this meeting was recorded.

56.

Upon information and belief, Defendants Lumpkin and Meg Heap wanted the employee fired to make an example out of her and were upset by Ms. Gibson-Carter's insistence on handling the matter differently.

57.

Upon information and belief, Defendants Lumpkin and Heap attempted to make what should have been an internal personnel matter to be handled at Ms. Gibson-Carter's discretion a matter relevant to the DA's Office and the entire law enforcement agencies affiliated with the RCC.

58.

To this day, the employee referenced in paragraphs 53-57 is employed by RCC; she was never terminated for her actions or for the alleged disparaging remarks against law enforcement.

59.

The RCC Board was aware of the events with the employee in question in paragraph 53-58 and did not admonish or notify Ms. Gibson-Carter's of any wrongdoing in Ms. Gibson-Carter's handling of the situation prior to the SCP's letter; rather the RCC Board supported Ms. Gibson-Carter's actions.

60.

Included in the binder of complaints against Ms. Gibson-Carter was an allegation that she breached client confidentiality by leaving a child's last name in the subject line of an email sent to DCFS, Alderman Van Johnson, and Commissioner Tabitha Odell on August 25, 2017. The family's identity was never made public.

61.

Defendant Lumpkin responded to and forwarded the same email with the child's last name in the subject line.

62.

On October 5, 2017, in a letter to Assistant District Attorney Greg McConnell, Ms. Gibson-Carter acknowledged and took responsibility for the administrative oversight of neglecting to redact a child's name in an email when urgently checking on their welfare.

63.

Though Ms. Gibson-Carter addressed this issue of not redacting a child's name in a letter to ADA McConnell in October 2017, Defendant Meg Heap brought it up again in December 2017, directly emphasizing that Ms. Gibson-Carter that could be charged with a misdemeanor *after* Ms. Gibson-Carter publicly spoke out against the District Attorney's office.

64.

The allegation that Ms. Gibson-Carter had breached confidentiality was known to at least one RCC Board member, Defendant Joseph Hogan, prior to the SCP's January letter; nothing was said to Ms. Gibson-Carter by the Board and no action was taken against Ms. Gibson-Carter by the RCC Board prior to her public statements in December 2017.

65.

Included in this binder was the allegation that Ms. Gibson-Carter was responsible for the RCC's non-compliance with CJCC Standards; CJCC conducts yearly site visits to determine compliance and RCC's 2017 review was positive. The 2018 review also showed compliance and was only released after she was terminated. There is no documented citation from CJCC.

66.

In situations where CJCC Victims Assistance Unit finds non-compliance, there is a path of corrective action taken that does not include terminating an individual in the rank of Executive Director from their position.

67.

At the February 2018 meeting between the RCC and SCP after Ms. Gibson-Carter made public statements criticizing the District Attorney's Office, Assistant District Attorney Lindretta Grindle Kramer, a Caucasian female, was especially vocal in her call for removal of Ms. Gibson-Carter.

68.

At the February 2018 meeting between the RCC and SCP after Ms. Gibson-Carter made public statements criticizing the District Attorney's Office, Special Assistant Attorney General for the Division of Family and Children's Services Defendant Wendy Furey a Caucasian female, was especially vocal in her call for removal of Ms. Gibson-Carter.

69.

At the February 2018 meeting between the RCC and SCP after Ms. Gibson-Carter made public statements criticizing the District Attorney's Office, Savannah Police Department Assistant Chief Defendant Robert Gavin, a Caucasian male, was especially vocal in his call for removal of Ms. Gibson-Carter.

70.

At the February 2018 meeting between the RCC and SCP after Ms. Gibson-Carter made public statements criticizing the District Attorney's Office, Assistant Chief Gavin told the RCC Board that the Savannah Police Department was in the process of pursuing grants to bring some of the RCC services in-house, effectively cutting RCC off from majority of the victims it currently serves.

71.

Ms. Gibson-Carter was told by Board member and Defendant Katie Joyner that the allegations presented in the February 2018 meeting all came from Caucasian individuals.

72.

Ms. Gibson-Carter was told by Board member and Defendant Sandra Clark that she felt like the February 2018 meeting was racially motivated.

73.

Ms. Gibson-Carter was told by Board member and Defendant Sandra Clark that Ms. Clark was the only African American in the room and that after the meeting with the SCP, Defendant and Board member Pat Douglas was exceptionally critical of Ms. Gibson-Carter and wanted to have the Board vote for her termination *that evening.*

74.

Not present at the February 2018 meeting was Devon Adams, an African American Sergeant over the Special Victims Unit at Savannah Metro.

75.

Ms. Gibson-Carter requested to be permitted to attend said February 2018 meeting; her request was **denied**.

76.

The binder provided by the SCP to the RCC, containing the SCPs concerns about Ms. Gibson-Carter, was disclosed to the media and subject to a front-page article in the Savannah Morning News on March 23, 2018.

77.

The Savannah Morning News article about Ms. Gibson-Carter was written by Jan Skutch, a Caucasian male, who had previously offered disparaging remarks in District Attorney and Defendant Meg Heap's office about Ms. Gibson-Carter in front of other individuals.

78.

On or about March 27, 2018, 4 days after the Savannah Morning news article, Board president and Defendant Heather Booth resigned for breaching attorney-client privilege in leaking the SCP's concerns to the news media.

79.

Defendant Heather Booth recommended the Abshire Public Relations Firm and Jennifer Abshire to the Board of Directors of the RCC to handle damage control due to the public outcry in support of Ms. Gibson-Carter.

80.

Abshire Public Relations firm coordinated a news article written by Jan Skutch that featured Defendant Heather Booth as the person who identified and facilitated the purchase of a new facility for the RCC and, upon information and belief, intentionally omitted Ms. Gibson-Carter though she played a major role in securing the building.

81.

Jennifer Abshire served on the Board of Directors for the SAFE Shelter, where Defendant Cheryl Branch is employed.

82.

Board member Defendant Pat Douglas admitted, at a Board meeting, that he spoke to the public about private and confidential issues regarding the SCP's concerns, and that he gave documentation to Assistant District Attorney Lindretta Grindle Kramer; he has not been asked to leave his position as a Board member.

83.

Upon information and belief, Defendants Mike Hughes and Brett Lundy communicated with and gave private and confidential documentation regarding the SCP's concerns to Alderwomen Carol Bell; neither of these individuals have been asked to leave their positions as Board members.

84.

In late February 2018, Ms. Gibson-Carter met with Defendants who sat on the RCC Board to refute or accept and take responsibility for the claims made against her by the SCP.

85.

Ms. Gibson-Carter also submitted to the Defendants who sat on the RCC Board, in writing, a rebuttal and accompanying support to all claims made against her.

86.

In response to Ms. Gibson-Carter's rebuttals to the claims alleged by the SCP, the Defendants who sat on the RCC Board asked Ms. Gibson-Carter why the community partners were coming forward now about alleged issues dating back to 2013. Ms. Gibson-Carter responded that it was her belief that the SCP's actions were racially

motivated and in retaliation for her speaking out in public City Council meetings about deficiencies in the investigation of sex crimes and the arrests and prosecution of sexual assault offenders—deficiencies that all bore directly on the job performances of the Defendants who signed the letter in this case.

**III. Prior to the SCP's letter, Ms. Gibson-Carter was a vocal advocate for rape victims without reprimand and with the support of the SCP**

87.

Prior to the SCP's letter of concern, RCC was fully aware that Ms. Gibson-Carter engaged in advocacy, speaking out on behalf of trauma victims on various platforms.

88.

Engaging in advocacy was a component of Ms. Gibson-Carter's job as Executive Director of the RCC.

89.

The RCC's job description for the position of Executive Director includes the following roles: "act as an official spokesperson for the Rape Crisis Center with all media;" "oversee development of public relations materials and public service announcements," and "participate in public speaking presentations and public service announcements."

90.

The Board members were aware of Ms. Gibson-Carter's statements at the
Council meeting in December 2017; the RCC never admonished Ms. Gibson-Carter for
speaking out prior to the SCP's January 2018 letter and their February 2018 meeting
with the RCC Board.

91.

Prior to the SCP's letter and demand for removal of Ms. Gibson-Carter, she was
never reprimanded by the Board, asked to change behavior by the Board, or offered
corrective action by the Board as a result of any public statements.

92.

In September 2015, Ms. Gibson-Carter's comments about backlogged rape kits in
Georgia were made public in a WTOC article; the Board was aware of these reports and
never admonished Ms. Gibson-Carter for making a statement.

93.

In March 2016, Ms. Gibson-Carter's comments about the Pursuing Justice for
Rape Victims Act were made public in a WTOC article; the Board was aware of these
reports and never admonished Ms. Gibson-Carter for making a statement.

94.

In August 2016, Ms. Gibson-Carter's comments about the backlogged rape kits
were made public in a WTOC article; the Board was aware of these reports and never
admonished Ms. Gibson-Carter for making a statement.

95.

In February 2017, Ms. Gibson-Carter's comments about fighting misogyny and rape culture were made public in a Connect Savannah article; the Board was aware of these reports and never admonished Ms. Gibson-Carter for making a statement.

96.

In March 2017, Ms. Gibson-Carter's comments about RCC's efforts to raise awareness and stop sexual violence were made public in a WTOC article; the Board was aware of these reports and never admonished Ms. Gibson-Carter for making a statement.

97.

On or about February 15, 2017, Defendants Meg Heap, Cheryl Branch, Rose Grant-Robinson, and Joseph Lumpkin signed a Memorandum of Understanding between the Rape Crisis Center, the Office of the District Attorney, Eastern Judicial District, Savannah Chatham Metropolitan Police Department, SAFE, and the Coastal Children's Advocacy Center, pledging that each agency would take on various responsibilities to effectively serve victims of sexual assault and related crimes. Ms. Gibson-Carter also signed this Memorandum.

98.

In the subject Memorandum of Understanding, under Role & Responsibilities, the Rape Crisis Center of the Coastal Empire agrees to "educate the community about sexual assault prevention," which includes informing the community about the status of timely action, or the lack thereof, against sexual assault offenders.

**IV. The RCC hires an external investigator, who finds no instances of misconduct that would warrant the removal of Ms. Gibson-Carter**

99.

After the January 2018 letter and the February 2018 meeting between the RCC and the SCP, Defendant RCC retained the law firm of Butler Rikard Mersereau LLP to perform an independent, external review in light of the issues raised by the community partners and agencies and to prepare a detailed review and evaluation plan designed to help the RCC identify issues and best addressed the perceived concerns.

100.

The final report of the investigation drafted by B. Davis Butler. Esq. was sent on April 3, 2018, with several conclusions and recommendations to the RCC.

101.

In the email sent on April 3, 2018, containing the final report, Mr. Butler wrote: "We like Kesha and think she has done a very good job on behalf of victims. The community partners **gave us no choice** but to recommend that her employment be terminated."

102.

The report found that Ms. Gibson-Carter was "completely gracious, bright, kind, and passionate about the victims she and RCC have served so well. She is clearly loved by many victims who have been supported extremely well by the RCC under her leadership."

103.

According to the report, out of the ten victims of different ages, races, and backgrounds that Butler interviewed in conducting the investigation for their report, all of them, plus numerous others who reached out to Butler via email, expressed strong support for Ms. Gibson-Carter and the people who work at the RCC.

104.

The report did *not* identify any instances of misconduct that would warrant removal of Ms. Gibson-Carter.

### V. The RCC's external investigator finds significant problems with the behavior of the Defendants on the RCC Board and the SCP

105.

Though the report did *not* identify misconduct by Ms. Gibson-Carter, the report *did* identify "significant problems with the behavior of the community partners", noting that "none of the community partner representatives wanted to meet with [Butler] individually and confidentially, as requested; instead, they asked to meet collectively"; the collective meeting between Butler and the SCPs was held on March 23, 2018.

106.

About the meeting on March 28, 2018, Butler wrote in his final report: "I was particularly frustrated with the treatment of Ray Smith, an African-American human resources expert that I had retained to help us on this project. Several officials were overtly dismissive of Ray and simply rude to both of us even though we were at the

meeting to try and help solve challenges. One senior official would not shake Ray's hand and completely ignored us."

107.

According to Butler's final report, Defendant RCC and the Defendant Board members did not provide clear guidance and boundaries to Ms. Gibson-Carter regarding the level of "advocacy" she was permitted to engage in.

108.

According to Butler's final report, "we do not believe that the current Executive Director was given proper detailed guidance from the Board."

109.

In his final report, Mr. Butler shared with the Board that he believed "there could possibly be a racial element involved in the challenges the RCC is facing."

110.

In April 2018, four months after the January letter was sent and in the same month as Butler's investigation found no misconduct by Ms. Gibson-Carter, RCC Board member and Defendant Kevin Shea drafted a letter to the Savannah Police Department on behalf of the RCC which said that the pressure from community partners left it "with **no option than to replace the current Executive Director**."

111.

The letter drafted by Defendant Kevin Shea stated: "Prior to taking the drastic step of replacing the RCC Executive Director, the Board would like to confirm that this is indeed the only option being made available to it, **and that it is still the intent of the**

**Savannah Police Department to bring advocacy and/or SANE services in-house to**

**replace the RCC for cases worked by SPD**."

112.

The letter drafted by Defendant Kevin Shea stated: "We kindly request a

response within 21 calendar days of receipt of this letter. Please note that a lack of

response will be taken by the Board to mean that you continue to require the

termination of the RCC Executive Director in order to ensure the survival of the RCC in

its present state…"

## VI. Despite the official investigator finding no misconduct by Ms. Gibson-Carter, she is terminated as Executive Director and is not provided a reason

113.

Six months after the initial letter was sent by the RCC, Ms. Gibson-Carter was

asked to resign; Ms. Gibson-Carter did not wish to resign.

114.

Defendant RCC fired Ms. Gibson-Carter on June 5, 2018.

115.

Though she asked repeatedly, Ms. Gibson-Carter was not given a reason for her

termination by the Board members.

116.

Upon information and belief, the Defendant RCC and the Defendant Board

members terminated Ms. Gibbons-Carter because it feared retaliation from community

partners.

**VII.** **Ms. Gibson-Carter's stellar performance as Executive Director was affirmed by the Board in August 2017, just 5 months before the SCP's letter of concern**

117.

Before the SCP's request to remove Ms. Gibson-Carter from her position, there was no indication from any Board members that Ms. Gibson-Carter's position as the Executive Director was at risk.

118.

Ms. Gibson-Carter's performance review for the year 2016 was completed on August 1, 2017 and conducted by Board members and Defendants Katie Joyner, Kimberly Fitz-Tanner, and Kevin Shea; **the report is overwhelmingly positive, and she received a significant increase in her salary around this time.** Ms. Gibson-Carter made the subject public statements **just four months** after this overwhelmingly positive review and salary increase by the Board.

119.

In said performance review conducted in August 2017, the Board members wrote, "Kesha has done an outstanding job leading the Rape Crisis Center of the Coastal Empire into a new era of advocacy, fundraising, and awareness." They go on to write that her efforts "demonstrate the rare balance of our Prevention & Advocacy mission…Furthermore, Kesha deserves particular accolades this year for the attention and respect the organization has earned with regard to local, state, and federal policy surrounding the timely processing of rape kits."

120.

In said performance review conducted in August 2017, the Board members wrote that community leadership "has been, and remains, one of Kesha's strongest – and most critical – assets as an organizational leader. She is consistently a champion for the mission, victims, and impact of the organization's work. She is respected by peers, funders, victims, and partners alike. Because of this work more arrests have been made, more kits have been processed, and more victims have found help."

121.

In said performance review conducted in August 2017, the Board members wrote, "Kesha has been innovative in her community leadership and willingness to use public forums and/or speaking engagements to turn by-standers into allies and adversaries into advocates."

122.

In said performance review conducted in August 2017, the Board members wrote, "Kesha maintains a strong relationship will all funders…this is most visible in the community trust she has sustained and earned for the organization."

123.

In said performance review conducted in August 2017, the Board members wrote, "The board has experienced a positive evolution in the last year in large part thanks to Kesha's leadership and willingness to address board development needs."

124.

In said performance review conducted in August 2017, the Board members wrote, "We're confident in the quality of leadership and organizational growth we've seen this year from the Executive Director, and plan to be more involved in setting mutual goals with the Executive Director and the Board in the year ahead."

125.

In said performance review conducted in August 2017, the Board members wrote, "Public community leadership should not be the job solely of the executive director. The Board acknowledges that this degree of focus has a toll on working relationships and pledges to work more closely with the Director in the year ahead so that the Director is not the only RCC voice for victims of rape, sexual assault, and sexual violence in our community."

126.

Performance deficiencies did not guide Defendant RCC's decision-making, as evidenced by, *inter alia*, the conclusions in her performance review, Butler's Report finding no circumstances of wrongdoing by Ms. Gibson-Carter, and both Butler and RCC's statements about being essentially forced to recommend termination and terminate, respectively, Ms. Gibson-Carter.

VIII.   **Acknowledgements from Board Members and Savannah Community Partners**

127.

Prior to signing the January Letter at issue in this Complaint, Defendant Joseph Lumpkin did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter from her role as Executive Director.

128.

Upon information and belief, Defendant Joseph Lumpkin signed the letter of concern on his last day of work for the Savannah Chatham Metropolitan Police Department.

129.

Prior to signing the January Letter at issue in this Complaint, Defendant Gilbert Ballard did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter from her role as Executive Director.

130.

Upon information and belief, Ms. Gibson-Carter and Defendant Gilbert Ballard have never directly communicated with one another.

131.

In an email exchange on February 3rd, 2018, Defendant Gilbert Ballard wrote: "our concern was due to other concerns, and we have not had a Garden Police Department and Rape Crisis specific issue"; significantly, although there were no

specific complaint or concern with Ms. Gibson-Carter or the RCC that directly involved any of the Garden City Police Department's cases, Defendant Ballard signed the letter.

132.

Prior to signing the January Letter at issue in this Complaint, Defendant Matt Libby did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter from her role as Executive Director.

133.

Upon information and belief, Ms. Gibson-Carter and Defendant Matt Libby have never directly communicated with one another.

134.

Prior to signing the January Letter at issue in this Complaint, Defendant Robert Bryson did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter from her role as Executive Director.

135.

Defendant Robert Bryson and Ms. Gibson-Carter had a cordial working relationship; Defendant Bryson told Ms. Gibson-Carter that the letter was sent to him by Defendant and District Attorney Meg Heap, and that **he did not even read it** prior to signing.

136.

Prior to signing the January Letter at issue in this Complaint, Defendant Cheryl Branch did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter from her role as Executive Director.

137.

When asked by her Board Chair to address her reason behind signing the January letter of concern, Defendant Cheryl Rogers was unable to articulate a valid reason, as she had no issues with the RCC or Ms. Gibson-Carter. As a result, Attorney Shelena Cook-Jones submitted a letter to RCC Board President and Defendant Heather Booth, indicating that she asked Cheryl Branch to cease participation in the efforts of the SCP to remove Ms. Gibson-Carter from the Executive Director position.

138.

Prior to signing the January Letter at issue in this Complaint, Defendant Rose Grant-Robinson did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter from her role as Executive Director.

139.

Defendant Rose Grant-Robinson of the Coastal Children's Advocacy Center called Ms. Gibson-Carter prior to signing the letter, to inform her that it was being circulated, and said that she was forced to sign it by at least one Board member, and that Ms. Gibson-Carter was being "rail-roaded."

140.

Prior to signing the January Letter at issue in this Complaint, Defendant Robert Merriman did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter from her role as Executive Director.

141.

Upon information and belief, Ms. Gibson-Carter and Defendant Robert Merriman have never directly communicated with one another and there has never been an issue between Thunderbolt Police Department concerning the RCC or Ms. Gibson-Carter.

142.

Upon information and belief, Defendant Merriman was either leaving for or returning from medical leave at the time he signed the January Letter.

143.

Prior to signing the January Letter at issue in this Complaint, Defendant A. Blair Jeffcoat did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter from her role as Executive Director.

144.

Upon information and belief, Ms. Gibson-Carter and Defendant Jeffcoat have never directly communicated with one another.

145.

Prior to signing the January Letter at issue in this Complaint, Defendant Mark Revenew did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter in order to continue a relationship with the RCC.

146.

In December 2017, Ms. Gibson-Carter encountered Defendant Revenew at the Savannah Chatham Day event. Defendant Revenew commented that "the whole thing doesn't make sense" and that he felt any challenges could be worked through.

147.

After signing the January Letter, Defendant Revenew and Ms. Gibson-Carter had a working relationship. Defendant Revenew acknowledged that the action initiated by the letter was a "turf-war."

148.

Prior to signing the January Letter at issue in this Complaint, Defendant Meg Heap did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter from her role as Executive Director.

149.

Defendant Meg Heap had often commended Ms. Gibson-Carter for helping her garner "black votes" during the 2012 election.

150.

Prior to signing the January Letter at issue in this Complaint, Defendant Wendy Furey did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter from her role as Executive Director.

151.

Prior to signing the subject January Letter at issue in this Complaint, Defendant Cheryl Rogers did not have a reasonable justification for requiring the removal of Ms. Gibson-Carter in order to continue a relationship with the RCC.

152.

Defendant Cheryl Rogers and Ms. Gibson-Carter were former colleagues; never once did Ms. Rogers correspond or address any issues about Ms. Gibson-Carter's performance with Ms. Gibson-Carter.

153.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Heather Booth had no reason to question Ms. Gibson-Carter's position as Executive Director.

154.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Deena Camacho had no reason to question Ms. Gibson-Carter's position as Executive Director.

155.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Sandra Clark had no reason to question Ms. Gibson-Carter's position as Executive Director.

156.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Pat Douglas had no reason to question Ms. Gibson-Carter's position as Executive Director.

157.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Kimberly Fritz-Tanner had no reason to question Ms. Gibson-Carter's position as Executive Director.

158.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Joseph Hogan had no reason to question Ms. Gibson-Carter's position as Executive Director.

159.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Mike Hughes had no reason to question Ms. Gibson-Carter's position as Executive Director.

160.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Katie Joyner-Barber had no reason to question Ms. Gibson-Carter's position as Executive Director.

161.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Brett Lundy had no reason to question Ms. Gibson-Carter's position as Executive Director.

162.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Mary Roberts had no reason to question Ms. Gibson-Carter's position as Executive Director.

163.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Kevin Shea had no reason to question Ms. Gibson-Carter's position as Executive Director.

164.

Prior to the SCP's demand for Ms. Gibson-Carter's removal in the January letter and February meeting at issue in this Complaint, Defendant and Board member Lynne Wolf had no reason to question Ms. Gibson-Carter's position as Executive Director.

## IX. Racially discriminatory animus against Ms. Gibson-Carter is shown by both Board members and the SCP

165.

Prior to her termination, Board members identified race as the primary motivation of the community partners wanting Ms. Gibson-Carter to be removed from her position as Executive Director.

166.

On January 23, 2018, Defendant and Board member Katie Joyner, a Caucasian female, told Ms. Gibson-Carter that she received the letter from the community partners and said, "it's racial."

167.

After receiving the letter from the SCP, Defendant Joyner recommended that Ms. Gibson-Carter hire a Caucasian female assistant to smooth over the differences with the community partners.

168.

Defendant and Board member Mr. Michael Hughes, a Caucasian male, asked what "color" attorney the Board retained to investigate the allegations against Ms. Gibson-Carter.

169.

Defendant and Board member Pat Douglas, a Caucasian male, said that "cultural differences" were the reason for issues with Ms. Gibson-Carter.

170.

Again, Butler wrote, in his report about his meeting with the community partners: "I was particularly frustrated with the treatment of Ray Smith, an African-American human resources expert that I had retained to help us on this project. Several officials were overtly dismissive of Ray and simply rude to both of us even though we were at the meeting to try and help solve challenges. One senior official would not shake Ray's hand and completely ignored us."

171.

All the SCPs who signed the letter, except for one, Defendant Rose Grant-Robinson, are Caucasian.

172.

Defendant Rose Grant-Robinson, the only African American community partner, told Ms. Gibson-Carter that she felt pressured into signing the letter of concern.

173.

All RCC Board members, except for one Defendant Sandra Clarke, are Caucasian.

174.

Although Defendant Sandra Clarke voted for the removal of Ms. Gibson-Carter, she told Ms. Gibson-Carter that she did not feel that she was presented with all the information and that if she had been, she may have voted otherwise.

175.

Defendant Sandra Clarke is the only African American Board member; she is also the only Board member **not** interviewed by the RCC's attorney in order to provide feedback on her thoughts and considerations regarding whether to terminate Ms. Gibson-Carter.

## COUNT I
## RACIAL DISCRIMINATION
## IN VIOLATION OF TITLE VII, 42 U.S.C. 2000 et seq
### *(Against the Rape Crisis Center)*

176.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-175, with emphasis on paragraphs 165-175, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

177.

Ms. Gibson-Carter is African American, a protected class, and was terminated by Defendants at least in part because of her race. To the extent that Defendants claim an alternative basis for the termination of Ms. Gibson-Carter, this is a mixed-motive case and Ms. Carter solely has to prove that her termination was motivated in some part based on her race. **Also, when Defendant Board members claim that race played a role regarding the attack on Ms. Gibson-Carter that led to her termination, she should be granted discovery to explore that issue**.

178.

Ms. Gibson-Carter is qualified for the position from which she was terminated.

179.

Of the 25 Board members and community partners, only 2 are African American; the rest are Caucasian. Through the course of events at issue in this Complaint, Defendant RCC displayed a discriminatory animus towards Ms. Gibson-Carter based on her race, based on the facts and assertions incorporated into this Count.

180.

Based on the incorporated facts to support this Count, prior to her termination,

Board members identified race as the primary motivation of the community partners

wanting Ms. Gibson-Carter to be removed from her position as Executive Director.

181.

Ms. Gibson-Carter is entitled to an award of back pay and benefits,

compensatory damages, attorney's fees, and all other appropriate damages, remedies,

and other relief available under Title VII and federal statutes providing remedies for

violation of Title VII.

### COUNT II
### RACIAL DISCRIMINATION
### IN VIOLATION OF 42 U.S.C. § 1981
### *(Against all Defendants)*

182.

Plaintiff now fully incorporates the facts and assertions found in paragraphs

1-175, as if fully stated herein to support all allegations made in this Count.

183.

Ms. Gibson-Carter is African American, a protected class, and was terminated by

Defendants in part because of her race.

184.

Based on the incorporated facts to support this Count, the Defendants named in

this Count discriminated upon Ms. Gibson-Carter based on her race. **Also, when**

**Defendant Board members claim that race played a role regarding the attack on Ms.**

**Gibson-Carter that led to her termination, she should be granted discovery to explore that issue**.

185.

Ms. Gibson-Carter is entitled to an award of back pay and benefits, compensatory damages, attorney's fees, and all other appropriate damages, remedies, and other relief available under Title VII and federal statutes providing remedies for violation of Title VII.

**COUNT III**
**CONSPIRACY TO VIOLATE A CONSTITUTIONAL RIGHT**
**IN VIOLATION OF 42 U.S.C § 1983**
*(Against All Defendants)*

186.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-175 and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

187.

At all times relevant to this Complaint, Ms. Gibson-Carter had a right to be free from violations and deprivations of the constitutional rights secured by the law.

188.

Based on the facts incorporated into this Count and the allegations within this Count, Defendants conspired against Ms. Gibson-Carter, motivated by retaliatory animus, because of her public statements against the Defendants, who prosecute sexual crimes. Also, before terminating her, Defendants prohibited Ms. Gibson-Carter from

further exercising her First Amendment Rights in the form of public criticism of Defendants deficiencies in detecting and prosecuting sexual assault crimes by intimidating her and telling her that she could not speak publicly in the manner that she had done at City Council meeting and Defendants had no lawful basis to infringe on Ms. Gibson-Carter's First Amendment rights in this manner. The "cats paw" theory, amongst other theories, applies to this case based on the facts incorporated to support this count because Ms. Gibson-Carter's termination is obviously a rubber stamp of the animus and will of the Defendants who signed the subject letter, led by Defendant Meg Heap.

189.

Based on the facts incorporated into this Count and the allegations within this Count, because of the overt actions committed by Defendants in connection with conspiracy, Ms. Gibson-Carter was injured through the loss of her employment and income and benefits, emotional distress, humiliation, and other indignities.

190.

Due to the Defendants' conduct, based on the facts incorporated into this Count and the allegations within this Count, Ms. Gibson-Carter is entitled to relief and compensatory damages permissible under controlling law.

**COUNT IV**
**CONSPIRACY TO VIOLATE A CONSTITUTIONAL RIGHT**
**IN VIOLATION OF 42 U.S.C. § 1985(3)**
*(Against All Defendants)*

191.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-175 and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

192.

At all times relevant to this Complaint, Ms. Gibson-Carter had a right to be free from violations and deprivations of the constitutional rights secured by the law.

193.

Based on the facts incorporated into this Count and the allegations within this Count, Defendants conspired against Ms. Gibson-Carter, motivated by retaliatory animus, because of her public statements against the Defendants, who prosecute sexual crimes. Also, before terminating her, Defendants prohibited Ms. Gibson-Carter from further exercising her First Amendment Rights in the form of public criticism of Defendants deficiencies in detecting and prosecuting sexual assault crimes by intimidating her and telling her that she could not speak publicly in the manner that she had done at City Council meeting and Defendants had no lawful basis to infringe on Ms. Gibson-Carter's First Amendment rights in this manner. The "cats paw" theory, amongst other theories, applies to this case based on the facts incorporated to support this count because Ms. Gibson-Carter's termination is obviously a rubber stamp of the

animus and will of the Defendants who signed the subject letter, led by Defendant Meg Heap.

194.

Based on the facts incorporated into this Count and the allegations within this Count, because of the overt actions committed by Defendants in connection with conspiracy, Ms. Gibson-Carter was injured through the loss of her employment and income and benefits, emotional distress, humiliation, and other indignities.

195.

Due to the Defendants' conduct, based on the facts incorporated into this Count and the allegations within this Count, Ms. Gibson-Carter is entitled to relief and compensatory damages permissible under controlling law.

## COUNT V
### 42 U.S.C. § 1983—VIOLATION OF FIRST AMENDMENT RIGHTS
### *(Against All Defendants)*

196.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-175 and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

197.

At all times relevant to this Complaint, Ms. Gibson-Carter had a right to be free from violations and deprivations of the constitutional rights secured by the law.

198.

Based on the incorporated facts to support this Count, Defendants unconstitutionally violated Ms. Gibson-Carter's First Amendment rights by terminating her for publicly speaking about her concerns surrounding deficiencies in the system that prosecutes sexual assault offenders. Ms. Gibson-Carter's termination occurred within months of her exercising her First amendment against the District Attorney and law enforcements agencies that prosecute sexual crimes. Also, before terminating her, Defendants prohibited Ms. Gibson-Carter from further exercising her First Amendment Rights in the form of public criticism of Defendants deficiencies in detecting and prosecuting sexual assault crimes by intimidating her and telling her that she could not speak publicly in the manner that she had done at City Council meeting and Defendants had no lawful basis to infringe on Ms. Gibson-Carter's First Amendment rights in this manner. The "cats paw" theory, amongst other theories, applies to this case based on the facts incorporated to support this count because Ms. Gibson-Carter's termination is obviously a rubber stamp of the animus and will of the Defendants who signed the subject letter, led by Defendant Meg Heap.

199.

As a result of Defendants' conduct, Ms. Gibson-Carter is entitled to compensable damages permissible under controlling law.

**COUNT VI**
**42 U.S.C. § 1983 – VIOLATION OF FIRST AMENDMENT RIGHTS BY**
**RETALIATION**
*(Against All Defendants)*

200.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-175 and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

201.

At all times relevant to this Complaint, Ms. Gibson-Carter had a right to be free from violations and deprivations of the constitutional rights secured by the law.

202.

Based on the incorporated facts to support this Count, Defendants unconstitutionally retaliated against Ms. Gibson-Carter for exercising her First Amendment rights through publicly speaking about her concerns surrounding deficiencies in the system that prosecutes sexual assault offenders. The SCP's call for her removal and Ms. Gibson-Carter's termination occurred within months of her exercising her First amendment against the District Attorney and law enforcements entities that prosecute sexual crimes, as described by the facts incorporated to support this Count.

203.

Based on the incorporated facts to support this Count, and the facts set forth in this Count, Defendants instigated and continued to ensure the removal of Ms. Gibson-Carter from her role as Executive Director. Also, before terminating her, Defendants

prohibited Ms. Gibson-Carter from further exercising her First Amendment Rights in the form of public criticism of Defendants deficiencies in detecting and prosecuting sexual assault crimes by intimidating her and telling her that she could not speak publicly in the manner that she had done at City Council meeting and Defendants had no lawful basis to infringe on Ms. Gibson-Carter's First Amendment rights in this manner. The "cats paw" theory, amongst other theories, applies to this case based on the facts incorporated to support this count because Ms. Gibson-Carter's termination is obviously a rubber stamp of the animus and will of the Defendants who signed the subject letter, led by Defendant Meg Heap.

## COUNT VII
## CLAIM FOR INJUNCTIVE AND DECLARATORY RELIEF
### *(Claim Against All Defendants)*

204.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-175 and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

205.

At all times relevant to this Complaint, Ms. Gibson-Carter had a right to be free from violations and deprivations of the constitutional rights secured by the law.

206.

Based on the incorporated facts to support this Count, and the facts set forth in this Count, Plaintiff is asking for injective relief in the form of at least restoring her employment position and awarding her back pay damages. The irreparable harm is

ongoing and cannot be resolved merely by monetary damages, and governing law supports restoring Plaintiff to her employment position due to losing that position as a direct and proximate cause of Defendants' violating her First Amendment rights, inter alia. Also, Plaintiff seeks declaratory judgment that she lost her subject employment position as a direct and proximate cause of Defendants' violating her First Amendment rights, inter alia; Ms. Gibson-Carter seeks declaratory judgment on this issue. Ms. Gibson-Carter's claims for declaratory and injunctive relief meet all applicable legal criteria for granting these claims.

**COUNT VIII**
**PUNITIVE DAMAGES**

207.

Based on the facts alleged in this complaint, Ms. Gibson-Carter is entitled to punitive damages under all applicable laws because Defendants acted with a willful and conscience indifference to the laws that protect Ms. Gibson-Carter's Constitutional and statutory rights.

**COUNT IX**
**ATTORNEY FEES**

208.

Based on the facts alleged in this Complaint, Ms. Gibson-Carter is entitled to attorney fees under all applicable laws, including fees under 42 U.S.C.A. § 1988 and applicable portions of 42 U.S.C.A. § 2000e-5.

## COUNT X
## SPECIAL DAMAGES

209.

Based on the facts alleged in this Complaint, Ms. Gibson-Carter is entitled to special damages of at least two hundred seventy-five thousand dollars ($275,000), a figure that includes back wages. Ms. Gibson-Carter will obtain an expert to provide an opinion on this matter.

## PRAYER FOR RELIEF

**WHEREFORE**, Ms. Gibson-Carter prays for a trial by jury of twelve and judgment against Defendant as follows:

(a)  The process issue and service be had on each Defendant;

(b)  That judgment be granted in favor of the Plaintiff against the Defendant, jointly and severally, for the injuries of Plaintiff;

(c)  That Plaintiff recover compensatory damages including pain and suffering, lost income and future lost income, and other expenses in an amount to be determined at trial;

(d)  Plaintiff be awarded special damages for her loss earnings and reduction in her earning capacity from Defendants;

(e)  That this Court issue an injunction requiring Ms. Gibson-Carter be reinstated in her position, and any other equitable relief this court deems necessary and justified;

(f)  That Plaintiff recover all costs of this litigation;

(g) That a jury trial be had on all issues so triable;

(h) Plaintiff have Judgment against Defendant for punitive damages; and

(i)  That Plaintiff receives such other and further relief as the Court deems just

and proper.

### JURY TRIAL DEMANDED

A jury trial is demanded by Plaintiff as to all matters.

Respectfully submitted this 3rd day of June 2019,

/s/MARIO WILLIAMS
Mario B. Williams (Ga # 235254)

**NDH LLC**
**WILLIAMS OINONEN, LLC**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
404-254-0442 / 404-935-9391 FAX
mwilliams@ndh-law.com