## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

KESHA GIBSON-CARTER,

       Plaintiff,

     v.

RAPE CRISIS CENTER; GILBERT
BALLARD; CHERYL BRANCH; HEATHER
BOOTH; ROBERT BRYSON; DEENA
CAMACHO; SANDRA CLARK; PAT
DOUGLAS; KIMBERLY FRITZ-TANNER;
WENDY FUREY; ROSE GRANT-
ROBINSON; MEG HEAP; JOSEPH HOGAN;
MIKE HUGHES; A. BLAIR JEFFCOAT;
KATIE JOYNER-BARBER; MATT LIBBY;
JOSEPH LUMPKIN; BRETT LUNDY;
MARK MERRIMAN; MARK REVENEW;
MARY ROBERTS; CHERYL ROGERS;
KEVIN SHEA; and LYNNE WOLF,

       Defendants.

CIVIL ACTION NO.: 4:19-cv-122

## O R D E R

This action concerns Plaintiff Kesha Gibson-Carter's employment (and eventual

termination) as the executive director of the Rape Crisis Center.  On June 3, 2019, Plaintiff filed a

Complaint alleging claims of race discrimination and violations of her First Amendment rights

pursuant to a variety of federal statutes.  (Doc. 1.)  Presently before the Court are a Motion to

Strike certain paragraphs from the Complaint, (doc. 54), and various Motions to Dismiss filed by

all but two of the Defendants in this case, (docs. 27, 30, 41, 45, 55–67, 85, 92).  The Defendants

who move to dismiss Plaintiff's claims do so pursuant to Federal Rule of Civil Procedure 12(b)(6),

arguing that Plaintiff fails to state claims upon which relief can be granted because the claims are insufficiently pled.  Some Defendants also contend that qualified immunity insulates them from liability.

For the reasons discussed herein, the Court **DENIES** the Motion to Strike filed by Defendants Rape Crisis Center, Lynne Wolf, Deena Camacho, Sandra Clark, Pat Douglas, Kimberly Fritz-Tanner, Joseph Hogan, Mike Hughes, Katie Joyner-Barber, Brett Lundy, Mary Roberts, and Kevin Shea, (doc. 54).  As to the Motions to Dismiss, Plaintiff has asserted some viable claims against some Defendants but has failed to do so for many of her claims against several of the named Defendants.  Thus, as explained below, the Court **GRANTS** the Motions to Dismiss filed by Defendants Wendy Furey, Gilbert Ballard, Robert Bryson, A. Blair Jeffcoat, Joseph H. Lumpkin, Matthew Libby, Mark Revenew, Meg Heap, Heather Booth, Rose Grant-Robinson, and Robert Merriman, (docs. 27, 30, 41, 45, 57, 85, 92), as to all claims asserted against each of them.  The Court further **GRANTS in part and DENIES in part** the Motions to Dismiss filed by Defendants Rape Crisis Center, Lynne Wolf, Deena Camacho, Sandra Clark, Pat Douglas, Kimberly Fritz-Tanner, Joseph Hogan, Mike Hughes, Katie Joyner-Barber, Brett Lundy, Mary Roberts, and Kevin Shea, (docs. 55, 56, 58–67).

## BACKGROUND

At the motion-to-dismiss stage, all well-pleaded factual allegations in a complaint must be taken as true and the complaint must be construed in the light most favorable to the plaintiff. Applying this standard to Plaintiff's Complaint, the salient facts for purposes of evaluating Defendants' Motions are discussed below.

## I.     Overview of Parties

Plaintiff, an African American female, worked as the Executive Director for Defendant Rape Crisis Center (hereinafter the "RCC") in Savannah, Georgia from 2013 until her termination in June 2018.  (Doc. 1, pp. 3–4.)  The RCC is funded by the City of Savannah, Chatham County, the United Way of the Coastal Empire, and Georgia's Criminal Justice Coordinating Council ("CJCC"), and it serves and advocates on behalf of sexual assault victims in Chatham County and six other nearby counties.  (Id. at p. 5; see id. at pp. 2–3.)  Plaintiff filed this lawsuit to challenge her termination and alleges that, prior to her termination in June 2018, she received positive feedback and performance reviews and that the Board of Directors for the RCC had specifically commended her advocacy and public speaking skills.  (See id. at pp. 33–35.)

Defendants Heather Booth, Lynne Wolf, Deena Camacho, Sandra Clark, Pat Douglas, Kimberly Fritz-Tanner, Joseph Hogan, Mike Hughes, Katie Joyner-Barber,[1] Brett Lundy, Mary Roberts, and Kevin Shea were all members of the Board of Directors for the RCC during some or all of the events at issue in the Complaint.  (See id. at pp. 5–9.)  Throughout this Order, the Court will occasionally refer to the foregoing individuals as the "RCC Board" or the "Board Defendants." The Court will also use the term "RCC Defendants" to refer collectively to Defendant RCC and the Board Defendants.

The remaining Defendants are not directly affiliated with the RCC but, through their employment with or representation of other organizations, had some sort of working relationship with Plaintiff and the RCC.  Those Defendants are:

---

[1]  In the caption of the Complaint and in some paragraphs of the Complaint, this Defendant is referred to as "Katie Joyner-Barber"; at other places in the Complaint, however, she is referred to simply as "Katie Joyner."  (Doc. 1, pp. 1, 7, 33.)  In her own Motion to Dismiss, she refers to herself as Katie Barber.  (Doc. 64.)  For purposes of this Order, the Court will refer to her as "Defendant Joyner-Barber."

- Joseph Lumpkin, Chief of the Savannah Chatham Metropolitan Police Department (hereinafter "Savannah Police Department");

- Meg Heap, District Attorney for the Eastern Judicial District in Georgia;

- Rose Grant-Robinson, employee of the Coastal Children's Advocacy Center;

- Wendy Furey, Special Assistant Attorney General for the Chatham County Department of Family and Children's Services ("DFACS");

- Gilbert Ballard, Chief of the Garden City Police Department;

- Matt Libby, Chief of the Port Wentworth Police Department;

- Robert Bryson, Chief of the Tybee Island Police Department;

- Robert Merriman, Chief of the Thunderbolt Police Department;

- A. Blair Jeffcoat, Chief of the Bloomingdale Police Department;

- Mark Revenew, Chief of the Pooler Police Department;

- Cheryl Branch, Executive Director of SAFE Shelter, Center for Domestic Violence;

- Cheryl Rogers, Director of a Victim-Witness Assistance Program.

(Id. at pp. 9–12, 15.)  According to Plaintiff, these individuals are also members of a group Plaintiff refers to as the "Savannah Community Partners" (at times, the "SCP") and refers to these Defendants collectively as the "SCP Defendants."  For ease of reference, the Court will do the same.[2]  Ten of the twelve SCP Defendants are Caucasian.  (Id. at p. 15.)  Lumpkin and Grant-Robinson are African American.  (Id. at pp. 7, 11.)

Labels aside, it is not clear from the Complaint whether the "SCP" is an organized group with additional members other than the named Defendants.  For instance, the Complaint notes that non-parties "Savannah-Chatham County Public School System Chief Terry Enoch and Savannah State Police Chief James Barnwell were not asked to sign the SCP's January letter of concern,

---

[2]  All of the SCP Defendants except for Branch and Rogers have filed motions to dismiss.

despite the fact that [Plaintiff] had more cases with the Board of Education and Savannah State University than many of the law enforcement agencies who signed the January letter." (Id. at p. 15.)  In her briefing, Plaintiff refers to Enoch and Barnwell as "[t]wo African American SCP members," (doc. 48, p. 17), indicating that the SCP is an organization with membership beyond the twelve SCP Defendants named in her Complaint.  The Court concludes that Plaintiff's use in the Complaint of the term "the SCP Defendants" at some points and her use of the broader and vaguer term "the SCP" at other points was deliberate, and the Court therefore declines to assume that an allegation that "the SCP" committed some act necessarily means that all of "the SCP *Defendants*" committed the act.[3]

## II.    Factual Allegations

### A.    The "Memorandum of Understanding"

It appears from the Complaint that the RCC had some sort of working relationship with each of the SCP Defendants' respective organizations; in February 2017, Plaintiff and Defendants Heap, Lumpkin, Grant-Robinson and Branch signed a "Memorandum of Understanding" on behalf of their organizations.  (Doc. 1, p. 28.)  In the Memorandum, each agency pledged to take on various responsibilities to effectively serve victims of sexual assault and related crimes.  (Id.)  For example, the RCC agreed to "educate the community about sexual assault prevention."  (Id.)

### B.    Plaintiff's Comments at December 2017 City Council Meetings

In December 2017, roughly ten months after she signed the Memorandum, Plaintiff attended a Savannah City Council meeting where she "publicly expressed her concerns about deficiencies in the Chatham County District Attorney's Office and its law enforcement affiliates' arrest, prosecution, and conviction rates of sexual assault offenders."  (Id. at p. 12.)  Defendant

---

[3] See Note 9, infra, for further support of this conclusion.

Lumpkin, the then-Chief of the Savannah Police Department, was present at this council meeting, but Plaintiff does not allege that he reacted or responded to Plaintiff's comments.[4]  (Id.)  There is also no allegation that any other Defendants were present at this meeting when Plaintiff spoke.

At some point after the City Council meeting, Defendant Heap, the District Attorney, "sat down with" Plaintiff and advised her "that she could be charged with a misdemeanor for neglecting to redact a [minor] child's [last] name from an email [she sent] in August 2017 . . . ."[5]  (Id. at pp. 13–14.)   According to her Complaint, Plaintiff had already "acknowledged and [taken] responsibility" for this "oversight" in an October 2017 letter to an assistant district attorney ("ADA") in Heap's office, (id. at p. 20), and "this issue was never brought up by Defendant Meg Heap until after [Plaintiff had] publicly stated her concerns about the deficiencies [in] the Chatham County District Attorney's office," (id. at p. 13).

Plaintiff subsequently attended a second Savannah City Council meeting in December 2017; during that meeting, she "publicly remarked" that Defendant Heap and her Office's "reaction to [Plaintiff's] comments at the last city council meeting was 'workplace bullying at its finest.'"  (Id. at pp. 13–14.)  Plaintiff also commented that she would not "give up, let up or stop or keep quiet."  (Id. at p. 14.)

---

[4]  Plaintiff alleges that, "[u]pon information and belief, Defendant Lumpkin, along with Defendant Meg Heap (District Attorney), decided [after the meeting] that action needed to be taken against [Plaintiff] for exercising her First Amendment rights."  (Doc. 1, p. 13.)  For the reasons discussed at length in Discussion Section II.B, infra, this allegation is not entitled to any assumption of truth for purposes of the Motion to Dismiss.

[5]  Plaintiff also alleges (rather vaguely) that, "[i]n an open meeting [on an unspecified date] between Defendant RCC and law enforcement," a non-party ADA from Defendant Heap's office "publicly uttered the same sentiments related to the alleged misdemeanor."  (Doc. 1, p. 13.)

### C.    Letter from the SCP to the RCC Board of Directors

The Complaint next alleges that, in the following month (January 2018), "a collection of Savannah Community Partners" delivered a letter to the RCC Board "complaining that 'important community relationships ha[d] become unnecessarily strained and less than productive.'"[6]  (Id.) The letter "complained of dissatisfaction but did not provide specifics as to any of the perceived challenges or suggestions on how to solve them; rather, the SCP requested time to speak with the entire RCC Board."  (Id.)  Plaintiff alleges that "[t]he letter was signed by Savannah Community Partners" and Defendants[7] Lumpkin, Ballard, Libby, Bryson, Branch, Grant-Robinson, Merriman, Jeffcoat, Revenew, Heap, Furey, and Rogers.  (Id. at p. 15.)  This group of individuals had not previously communicated any collective concerns about Plaintiff to the RCC Board.[8]  (Id. at p. 16.)  According to the Complaint, Defendants Booth, Camacho, Clark, Douglas, Fritz-Tanner, Hogan, Hughes, Joyner-Barber, Lundy, Roberts, Shea, and Wolf were all members of the RCC Board of Directors at this point in time.  (Id. at pp. 5–11.)

### D.    The February 2018 Meeting with the RCC Board

Plaintiff alleges that, pursuant to the request in the January 2018 letter, "the SCP met with the RCC Board in February 2018 and requested the removal of [Plaintiff] as the Executive Director."  (Id. at p. 16.)  Plaintiff asked to attend the February 2018 meeting, but her request was

---

[6]  Plaintiff did not attach the letter as an exhibit to her Complaint, nor has any party provided a copy of it with their motions or briefs.

[7]  Because Plaintiff did not attach a copy of the letter to her Complaint, and due to vague wording in the Complaint and Plaintiff's responsive briefing, it is not clear whether all of the individuals who signed the letter have been named as Defendants in this case, or whether, instead, there are additional "Savannah Community Partners" who signed the letter but have not been named as Defendants.

[8]  Despite alleging that both Lumpkin and Grant-Robinson are African American, (doc. 1, pp. 7–11, 15), Plaintiff proceeds to repeatedly assert that only *one* of the signatories was African American, (see id. at pp. 45–46.)

denied.  (Id. at p. 23.)  The Complaint repeatedly refers generally to "the SCP" as participating in the meeting, as if it is a larger organized group or entity (with members other than the SCP *Defendants*).  (See, e.g., id. at pp. 16–26; see also Background Section I, supra.)  While the Complaint explicitly states that SCP Defendant Furey attended this meeting, (id. at p. 22), it does not allege that any of the other SCP *Defendants* were present.[9]

At the February 2018 meeting, "the SCP" provided the Board with a recording of a phone call between Plaintiff and a Savannah Police Department officer as well as a binder containing more than twenty-five "complaints" and/or "issues" with Plaintiff dating back to 2013.  (Id. at pp. 17–20.)  The Complaint only provides information about four such issues.  (Id.)  First, the binder contained a complaint alleging that Plaintiff had "unilaterally" altered the "SART Sexual Assault Protocol to dictate that Sexual Assault Nurse Examiners . . . would perform sexual assault examinations on prepubescent victims."[10]  (Id. at pp. 17–18.)  According to Plaintiff, this protocol change occurred more than one year prior to the February 2018 meeting, and, while she admits that she "proposed a revision" to the protocol prior to its alteration, she denies that she changed

---

[9]  In Background Section I, supra, the Court determined that Plaintiff's delineation between "the SCP" and "SCP Defendants" was deliberate.  This conclusion is supported by the fact that two of the three "SCP" members whom Plaintiff specifically alleges attended the meeting are not defendants in this suit (and were not alleged to have signed the January 2018 letter).  (Doc. 1, p. 22.)  Specifically, the Complaint alleges that an SCP member named Lindretta Grindle Kramer, an ADA from Heap's office, attended the meeting and "was especially vocal in her call for removal of [Plaintiff]."  (Id.)  Plaintiff also alleges that Savannah Police Department Assistant Chief Robert Gavin attended and "was especially vocal in his call for removal of [Plaintiff]."  (Id.)  There is no specific allegation that Defendant Heap accompanied Kramer, her ADA, or that Defendant Lumpkin accompanied Gavin, an assistant chief at the police department.  Moreover, the Complaint alleges that Defendant Lumpkin signed the January 2018 letter on his last day of work for the Savannah Police Department, undermining any implication that he attended the February 2018 meeting.  (Id. at p. 36.)  Finally, Plaintiff alleges that Board Member Clark told her that she (Clark) was "the only African American in the room" at the February 2018 meeting, (id. at p. 23), which indicates that neither Defendant Lumpkin nor Defendant Grant-Robinson, who are both African American, would have been present.

[10]  Plaintiff uses the abbreviation "SART" throughout her Complaint but does not provide a definition or any sort of context regarding the abbreviation's relevance and importance.

the protocol "unilaterally." (Id.)  Additionally, Plaintiff notes that the Board had not previously admonished her for her "suggestions of revising the SART's Sexual Assault Protocol." (Id. at p. 18.)

The second issue from the binder condemned Plaintiff's handling of a complaint about an RCC employee who allegedly made disparaging comments to law enforcement representatives during a victim interview. (Id. at p. 19.)  Plaintiff avers that she first learned about this issue in an email sent to her by Defendant Lumpkin just prior to the first December 2017 City Council meeting. (Id.)  After receiving the complaint, Plaintiff spoke to both the employee and the victim (who told Plaintiff the employee had done nothing wrong).[11]  (Id.)  The Complaint does not state precisely how Plaintiff handled the matter, but it does indicate that she did not fire the employee. (Id.)  According to Plaintiff, the RCC Board was aware of this issue prior to the February 2018 meeting and had not "admonish[ed] . . . [her] handling of the situation," and had actually "supported [her] actions." (Id. at p. 20.)

The binder also contained a complaint concerning Plaintiff's failure to redact a child victim's last name in the subject line of the August 2017 email (which has previously been referenced and discussed in this Order). (Id. at p. 20.)  Plaintiff admits this "oversight" was a breach of client confidentiality; however, she says that, despite one Board member knowing about the breach prior to the December 2017 City Council meetings, the Board had not previously raised the issue with her. (Id. at pp. 20–21.)

---

[11]   In reference to this issue, the Complaint alleges that, "[u]pon information and belief, Defendants Lumpkin and . . . Heap wanted the employee fired to make an example out of her and were upset by [Plaintiff's] insistence on handling the matter differently." (Doc. 1, p. 19.)  For the reasons discussed in depth in Discussion Section II, _infra_, this allegation is not entitled to any assumption of truth for purposes of the Motion to Dismiss.

The fourth and final "issue" described in the Complaint (out of the twenty-five total issues presented in the binder) concerned a claim that Plaintiff "was responsible for the RCC's non-compliance with CJCC Standards." (Id.)  Plaintiff denies that the RCC was non-compliant, stating that the CJCC review for 2017 "was positive" and that the 2018 review "showed compliance." (Id.)

Plaintiff's final allegation regarding the February 2018 meeting is that, during the meeting, three Caucasian individuals—Defendant Furey and non-parties Kramer and Gavin—were "especially vocal in [their] call[s] for [her] removal," and that Gavin "told the RCC Board that the Savannah Police Department was in the process of pursuing grants to bring some of the RCC services in-house, effectively cutting RCC off from [the] majority of the victims it currently serves." (Id. at pp. 22–23.)

### E.      Plaintiff's Discussions with the RCC Board and Individual Board Members

Plaintiff discussed the January 2018 letter and/or the February 2018 meeting with two individual Board Members—Defendants Joyner-Barber and Clark.  Prior to the February 2018 meeting, Joyner-Barber told Plaintiff that she had received the January 2018 letter and that "it [was] racial."  (Id. at p. 44.)  Joyner-Barber then recommended that Plaintiff hire a Caucasian female assistant to "smooth over the differences with the community partners."  (Id.)  After the February 2018 meeting, Joyner-Barber told Plaintiff that "the allegations presented in the February 2018 meeting all came from Caucasian individuals."  (Id. at p. 23.)  Additionally, Clark told Plaintiff that, during the meeting, she was the only African American in the room and that she "felt like the . . . meeting was racially motivated."[12]  (Id.)  Clark also told Plaintiff that Defendant

---

[12]  Plaintiff specifically notes that "Devon Adams, an African American Sergeant over the Special Victims Unit at Savannah Metro," was not present at the meeting.  (Doc. 1, p. 23.)  There is no indication, however, that Mr. Adams was a signatory to the January 2018 letter (or was otherwise a member of "the SCP") and

Douglas, a member of the RCC Board, had been "exceptionally critical" of Plaintiff and "wanted to have the Board vote for her termination that evening." (Id.)

In "late February 2018," Plaintiff then met with the RCC Board "to refute or accept and take responsibility for the claims made against her by the SCP."[13] (Id. at p. 25.) She also submitted a written rebuttal and "accompanying support to all claims made against her." (Id.) The Board asked Plaintiff "why the community partners were coming forward now about alleged issues dating back to 2013." (Id.) In response, Plaintiff advised that

> [I]t was her belief that the SCP's actions were racially motivated and in retaliation for her speaking out in public City Council meetings about deficiencies in the investigation of sex crimes and the arrests and prosecution of sexual assault offenders—deficiencies that all bore directly on the job performances of the Defendants who signed the letter in this case.

(Id. at pp. 25–26.)

In support of this explanation, Plaintiff alleges that the Board Defendants were aware of her "statements at the December 2017 [C]ity [C]ouncil meeting" before January 2018 but did not admonish her "for speaking out prior to the SCP's January 2018 letter and the[] February 2018 meeting with the RCC Board." (Id. at p. 27.) Likewise, the Board did not reprimand her, ask her to change her behavior, or offer any corrective action as a result of any of her public statements prior to the letter and the meeting. (Id.) Notably, while these allegations imply that she was eventually admonished, reprimanded or in some way dressed down by the Board for her City

---

thus should have been expected to attend the meeting, nor is there any indication that he was not invited to attend the meeting.

[13] Plaintiff does not indicate which claims she "accept[ed] and t[ook] responsibility for" or which claims she refuted or rebutted. (See doc. 1, p. 25.)

Council statements *after* the letter and the meeting, the Complaint is devoid of allegations to support such an implication.[14]  (See generally doc. 1.)

### F.     The RCC Defendants' Actions after the February 2018 Meeting

#### (1)     The Independent Investigation

Following the February 2018 meeting, the Board hired a law firm to perform what Plaintiff describes as an "independent, external review in light of the issues raised by the community partners and agencies and to prepare a detailed review and evaluation plan designed to help the RCC identify issues and best addressed [sic] the perceived concerns."  (Id. at p. 29.)  The firm interviewed Plaintiff, ten victims, and an unspecified number of unidentified "community partner representatives," and, on April 3, 2018, attorney B. Davis Butler provided the RCC with a report containing "several conclusions and recommendations."  (Id. at pp. 29–30.)

Throughout her Complaint, Plaintiff quotes portions of the report as well as the email to which the report was attached.[15]  The email stated: "We like Kesha and think she has done a very good job on behalf of victims.  The community partners gave us no choice but to recommend that her employment be terminated."  (Id. at p. 29; see also doc. 98-1, pp. 2–3 (copy of email provided by Plaintiff in response to Motion to Strike).)  According to the Complaint, the report itself stated that Plaintiff was "completely gracious, bright, kind, and passionate about the victims," and that

---

[14]  The Complaint also provides examples of times Plaintiff had previously made public statements of which the Board was aware (i.e., comments about backlogged rape kits in Georgia and about the Pursuing Justice for Rape Victims Act, which were published in articles in 2015 and 2016, and comments about "fighting misogyny and rape culture" and "rais[ing] awareness and stop[ping] sexual violence," which were published in articles in 2017) and she alleges that she had not been admonished by the Board or otherwise told to change her behavior at those times.  (Doc. 1, pp. 27–28.)

[15]  While a copy of the email was eventually attached as an exhibit to Plaintiff's Response to the Motion to Strike, Butler's report has not been provided (as an exhibit to the Complaint or to any other pleading).

she is "clearly loved by many victims who have been supported extremely well by the RCC under her leadership."  (Doc. 1, p. 29.)

According to Plaintiff, the report did not identify any instances of misconduct that would warrant her termination.  (Id. at p. 30.)  The report did, however, describe "'significant problems with the behavior of the community partners,' noting that 'none of the community partner representatives wanted to meet with [Butler] individually and confidentially, as requested; instead, they asked to meet collectively.'"  (Id.)  Plaintiff does not indicate whether the report described the substance of Butler's meeting with the "community partner representatives;" however, she does quote Butler's commentary that, during the meeting, he "was particularly frustrated with the [community partner representatives'] treatment of Ray Smith, an African American human resources expert that [Butler] had retained to help [him] on this project."  (Id. (quoting the report).) According to the Complaint, the report stated that "[s]everal officials were overtly dismissive of Ray and simply rude to both [Ray and Butler] . . . .  One senior official would not shake Ray's hand and completely ignored [Ray and Butler]."  (Id. at pp. 30–31 (quoting the report).)  The report also advised of Butler's belief that "there could possibly be a racial element involved in the challenges the RCC is facing."  (Id. at p. 31 (quoting the report).)

According to the Complaint, the report found that the Board "did not provide clear [or proper] detailed guidance and boundaries to [Plaintiff] regarding the level of 'advocacy' which she was permitted to engage in."  (Id.)  The Complaint does not elaborate on the basis for this conclusion, nor does it indicate that this somehow factored into the termination recommendation. Butler's termination recommendation apparently was simply expressed in the email to which the report was attached, stating: "The community partners gave us no choice but to recommend that [Plaintiff's] employment be terminated."  (Id. at p. 29 (quoting the email).)

13

### (2)    The RCC Defendants' Letter to the Savannah Police Department

Sometime in April 2018, Defendant Shea, an RCC Board member, "drafted a letter to the Savannah Police Department on behalf of the RCC [saying] that the pressure from community partners left it 'with no option than to replace the current Executive Director.'" (Id. at p. 31 (quoting the letter).)  The letter also advised that, "[p]rior to taking the drastic step of replacing the RCC Executive Director, the Board would like to confirm that this is indeed the only option being made available to it, and that it is still the intent of the Savannah Police Department to bring advocacy and/or SANE services in-house to replace the RCC for cases worked by [the Savannah Police Department]." (Id. at pp. 31–32 (quoting the letter).)  The letter requested a response within three weeks and noted that a lack of response "would be taken by the Board to mean that you continue to require the termination of [Plaintiff] in order to ensure the survival of the RCC in its present state…"[16]  (Id. at p. 32 (quoting the letter) (internal quotation marks omitted).)  The Complaint provides no indication of whether anyone with the Savannah Police Department responded.

### (3)    Plaintiff's Termination

Plaintiff was eventually asked to resign but she declined to do so; on June 5, 2018, Defendant RCC terminated her role as Executive Director.  (Id.)  RCC did not give Plaintiff a reason for her termination.  (Id.)  According to Plaintiff, Defendant Clark—the only non-Caucasian member of the Board—voted for Plaintiff's termination but told Plaintiff "she did not feel that she was presented with all the information and that if she had been, she may have voted otherwise." (Id. at p. 45.)  Plaintiff also states that Clark was "the only Board member not interviewed by the

---

[16] The Complaint repeatedly alleges that Defendant Shea "drafted" the letter, but it does not actually allege that the letter was sent to, delivered to, or received by—much less responded to by—anyone at the Savannah Police Department.

14

RCC's attorney in order to provide feedback on her thoughts and considerations regarding whether to terminate [Plaintiff]." (Id.)

## III.    Plaintiff's Causes of Action

In her Complaint, Plaintiff asserts ten claims stemming from Defendants' behavior after she spoke publicly "about [Defendants and] her concerns surrounding deficiencies in the system that prosecutes sexual assault offenders." (Id. at pp. 46–56.)  Specifically, Plaintiff alleges that Defendants conspired to "intimidate[] her . . . [so] that she [w]ould not speak publicly in that manner again" and to "instigate[] and continue[] to ensure the removal of [her] from her role as Executive Director." (Id. at pp. 52–54.)  Plaintiff contends that these actions and her eventual termination were motivated, at least in part, by race and/or retaliatory animus stemming from her public statements.  (Id. at pp. 53–54.)  Based on these allegations, Plaintiff asserts a claim against the RCC for race discrimination in violation of Title VII (42 U.S.C. 2000 et. seq.) (Count I), and claims against all Defendants for: race discrimination in violation of 42 U.S.C. § 1981 (Count II); retaliatory termination in violation of the First Amendment pursuant to 42 U.S.C. § 1983 (Counts V, VI); conspiracy to violate her First Amendment rights pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3) (Counts III, IV); injunctive relief by way of her reinstatement as Executive Director and declaratory relief through a declaration that Defendants' violation of her First Amendment rights caused her termination (Count VII); punitive damages (Count VIII); attorney's fees pursuant to 42 U.S.C. § 1988 and Title VII (Count IX); and special damages for back wages, totaling $275,000 (Count X).

## DISCUSSION

### I.   Motion to Strike

The RCC and the Board Defendants filed a Motion to Strike Immaterial and Impertinent Material from Plaintiff's Complaint.  (Doc. 54.)  The Motion requests that the Court strike seven paragraphs from Plaintiff's Complaint that contain quotes from Butler's report and/or Butler's email to Defendant Joyner-Barber transmitting the report.  (Doc. 54-1, pp. 1–3 (quoting doc. 1, pp. 29–31, 44).)  The moving Defendants claim that the at-issue excerpts are "immaterial and impertinent references to confidential and privileged information" and are protected by the attorney-client privilege.  (Id. at pp. 1–2.)

Three pieces of evidence, which were not attached as exhibits to the Complaint, were submitted by the parties in connection with their briefing on the Motion to Strike and will be considered by the Court in disposing of the Motion.  First, as an exhibit to their Motion, the RCC Defendants submitted a copy of the engagement letter provided by Butler after he was hired.  (See doc. 54-2 (affidavit of Kristen Goodman, the RCC Board's legal counsel, to which the engagement letter is attached as an exhibit).)  Plaintiff attached the second document as an exhibit to her Response in opposition to the Motion to Strike.  (Doc. 98.)  This piece of evidence is a forwarded copy of the email that Butler sent to Defendant Joyner-Barber (entitled "Report to the RCC Board") when he provided his report; notably, this exhibit shows that Butler's email was forwarded to Plaintiff *by Joyner-Barber* the day after Butler sent it to Joyner-Barber.  (Doc. 98-1, pp. 2–3.)  The third piece of evidence, provided by the RCC Defendants with their Reply in support of the Motion to Strike, is a copy of an email sent by Defendant Shea to other members of the RCC Board, stating: "As Davis advised me, the report from Davis Butler is covered by attorney-client privilege and as a result is not subject to discovery in a lawsuit. . . .  As a reminder, please do not

16

make any part of the report available to anyone not on the RCC Board." (Doc. 54-2, p. 8.) Each of these three exhibits will be described in more detail and analyzed below.

### A.   Standard of Review

Under Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "While not squarely within the grounds for a motion to strike under Rule 12(f), courts have considered motions to strike based on attorney-client privilege as motions to strike impertinent material since privileged material is 'not able to be discovered and presented at trial.'" U.S. ex rel. Schaengold v. Mem'l Health, Inc., No. 4:11-cv-58, 2014 WL 5767042, at *2 (S.D. Ga. Nov. 5, 2014) (citing Otero v. Vito, No. 5:04CV211DF, 2005 WL 1429755, at *1 (M.D. Ga. June 15, 2005)). Therefore, if the Court finds that any of the specified paragraphs of the Complaint are protected by attorney-client privilege, it can strike such paragraphs from the pleading.

Still, "striking material from a pleading 'is a drastic remedy to be resorted to only when required for the purposes of justice.'" Id. (quoting Augustus v. Bd. of Pub. Instruction, 306 F.2d 862, 868 (5th Cir. 1962)[17]; see also Graphic Packaging Int'l, Inc. v. C.W. Zumbiel Co., No. 1:10-cv-3008, 2011 WL 5829674, at *2 (N.D. Ga. Aug. 1, 2011). The Court has broad discretion in considering a motion to strike under Rule 12(f). See Bingham v. HCA, Inc., 783 F. App'x 868, 872 (11th Cir. 2019) (per curiam) ("We review the district court's grant of [a defendant]'s motion to strike alleged facts from [the plaintiff]'s [complaint] under [Rule] 12(f) for an abuse of discretion . . . . The abuse of discretion standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." (internal citations omitted)).

---

[17] In Bonner v. City of Pritchard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit prior to October 1, 1981.

For the reasons discussed below, the Court declines to exercise its discretion to strike the requested material from the record.

**B.   Analysis**

   **(1)   Whether Plaintiff's Complaint Contains Material That is Redundant, Immaterial, Impertinent, or Scandalous**

The RCC Defendants argue that the excerpts from and allegations concerning Butler's email and report are "wholly immaterial and impertinent" to Plaintiff's claims against them, "and serve only to breach Defendants' attorney-client privilege and confidences." (Doc. 54-1, pp. 4–5.) In her Response, Plaintiff argues that the report and email are relevant and serve as evidence that she was terminated because of community partner pressure and racial animus—not her own lack of performance. (Doc. 98, p. 7 (emphasis omitted).)

The Court agrees with Plaintiff. The email and report contain information regarding an investigation—preceding Plaintiff's termination—into Plaintiff's job performance and into complaints from "community partners" about her conduct, (see doc. 1, pp. 29–31; doc. 54-1, p. 2, 6; doc. 54-2, p. 5); the Court fails to see how that information is irrelevant or immaterial to Plaintiff's lawsuit challenging the legality of her termination. Indeed, Plaintiff cites the report and email throughout her Complaint to show that: Butler did not identify any shortcomings in her performance as Executive Director; Butler recommended her termination due to some sort of influence exerted by or associated with some "community partners"; and the report and email notified the RCC Defendants that some "community partners" pushing for Plaintiff's removal may have had racially discriminatory motives. (Doc. 1, pp. 29–31.) The RCC Defendants have not shown how these potential uses have no possible relation to the present controversy, nor do they cite any case law supporting their argument that the Court should use the drastic remedy of striking the excerpts as redundant, immaterial, impertinent, or scandalous.

(2)    **Whether the Attorney-Client Privilege Applies to the Challenged Information in Plaintiff's Complaint**

Defendants also argue that the quoted portions of Butler's email and report are protected by the attorney-client privilege.  "The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential."  United States v. Schaltenbrand, 930 F.2d 1554, 1562 (11th Cir. 1991).  "To determine if a particular communication is confidential . . ., the privilege holder must prove the communication was '(1) intended to remain confidential *and* (2) under the circumstances was *reasonably* expected and understood to be confidential.'"  Bogle v. McClure, 332 F.3d 1347, 1358 (11th Cir. 2003).  To carry its burden, a party must show "that the primary purpose of the communication was to relay, request or transmit legal advice."  United States v. Davita, Inc., 301 F.R.D. 676, 682 (N.D. Ga. 2014).  Thus, "[w]here a lawyer provides non-legal business advice, the communication is not privileged."  Id. (quoting Wachtel v. Health Net, Inc., 482 F.3d 225, 231 (3d Cir. 2007)).

The burden of sustaining a claim of privilege is a "heavy" one.  Bridgewater v. Carnival Corp., 286 F.R.D. 636, 639 (S.D. Fla. 2011).  Privileges are neither "lightly created nor expansively construed, for they are in derogation of the search for truth."  United States v. Nixon, 418 U.S. 683, 710 (1974).  Plainly, "[the] burden is not . . . discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed."  Bridgewater, 286 F.R.D. at 639 (quoting In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965)).

Applying the foregoing principles to this case, the fact that Butler—an attorney—provided the email and report to Defendants does not necessarily prove that the communications were privileged; rather, the Court must examine the work performed by Butler and the substance of at-

issue documents themselves to determine whether the attorney-client privilege applies. Looking first at the engagement letter, under the heading "Scope of Representation," the letter states that the firm was "engaged by the RCC Board of Directors to represent RCC on legal matters concerning issues recently raised by RCC's community partners." (Doc. 54-2, p. 5.) While the letter notes generally that "[t]he attorney-client relationship is one of mutual trust and confidence," it does not expressly indicate that Butler was hired to provide legal advice to the RCC or that a report would be produced, let alone that such a report would be subject to the attorney-client privilege or other confidentiality requirements. (Id. at pp. 5–6.) The letter similarly does not indicate that Butler was hired to advise the RCC on anything such as whether it had legal grounds to terminate Plaintiff. As such, this letter does not establish that the at-issue communications constituted legal advice protected by the attorney-client privilege.[18]

Turning to the email and the report themselves—based on the quotes provided in the Complaint—Butler's work appears to be more akin to a personnel or human resources investigation (prompted by the allegations that Plaintiff was not effectively performing her job) and less akin to advice on legal issues or the legality of any action being considered by the RCC Defendants. For instance, in the at-issue communications, Butler recounts bringing a "human resources expert" with him to at least one meeting, (doc. 1, pp. 30–31), interviewing at least ten victims served by the RCC, (id. at p. 30), meeting with multiple community partners, (id. at pp. 30–31), and getting to know Plaintiff (whom he called "gracious, bright, kind and passionate"),

---

[18] Notably, the RCC Defendants failed to provide the second page of the engagement letter. (See doc. 54-2, pp. 5–6.) According to Goodman's affidavit (to which the engagement letter was attached), the second page of the engagement letter provided that, "following termination of the attorney-client relationship, 'any otherwise non-public information . . . *supplied to [the law firm]* and which is retained . . . will be kept confidential in accordance with applicable rules of professional conduct.'" (Id. at p. 2 (emphasis added).) This provision does not relate to Butler's report or his communications and the extent to which they were to be protected by the attorney-client privilege.

(id. at p. 29).  The Complaint also indicates that Butler interviewed all but one of the members of the Board.  (Id. at p. 45.)

To be sure, Butler's email and report provide opinions.  Specifically, he opined: (1) that Plaintiff "ha[d] done a very good job on behalf of victims;" (2) that she was not given "proper detailed guidance from the Board" regarding the level of "advocacy" she was permitted to engage in; and (3) that "there could possibly be a racial element involved in the challenges the RCC is facing."  (Id. at pp. 29–31.)  He apparently also recommended that Plaintiff's employment be terminated, but the Complaint only references the recommendation's inclusion in the *email*, not the report itself.  (Id. at p. 29.)  Moreover, Butler's email states only that he was making the recommendation because the community partners "gave [him] no choice" but to do so, and there is no indication that he cited, referenced or discussed any legal authority or any facts showing that the recommendation constituted or in any way pertained to *legal* advice.  (Id.; see also doc. 98-1, p. 2.)  Thus, there is no indication that Butler advised the RCC Defendants on any related legal issues, such as legal risks associated with retaining or terminating Plaintiff (i.e., litigation or the loss of any sort of governmental approval, funding or licensing, etc.).  See, e.g., Jackson v. Deen, No. 4:12-cv-139, 2013 WL 3863889, at *5 (S.D. Ga. July 25, 2013) (attorney-client privilege does not apply where counsel "act[s] as more than a legal advisor," for instance, "where it employs its counsel in oversight or investigatory activities," like investigating harassment complaints).  In sum, the RCC has failed to show that the communications from Butler relayed or transmitted legal impressions, concerns, or advice.

Finally, there is no compelling evidence that, at the time Butler drafted and sent the report and email to Defendant Joyner-Barber, the communications were intended to be confidential,

privileged, or the like.  While the Court has not been provided a copy of the full report,[19] it has been provided a copy of the email to which it was attached.  (Doc. 98-1, pp. 2–3.)  Neither the subject line nor the body of the email contain any statement or language advising that the email and/or any attachments are confidential or subject to the attorney-client privilege.  Additionally, the email shows that the attached PDF is entitled "RCC Final Report v3," and thus features no warning or proviso regarding privilege or confidentiality.  This stands in stark contrast to Shea's email, which the RCC Defendants rely on in an effort to prove that Butler's report and email were intended to be protected by the attorney-client privilege.  Shea's email, sent to other members of the RCC Board ten days after Butler emailed Joyner-Barber the report, stated: "As Davis advised me, the report from Davis Butler is covered by attorney-client privilege and as a result is not subject to discovery in a lawsuit. . . .  As a reminder, please do not make any part of the report available to anyone not on the RCC Board."  (Doc. 54-2, p. 8.)  In contrast to Butler's email, the subject line of Shea's email reads: "*[Attorney-Client Privileged]* Re: Attorney Report."  (Id. (emphasis added).)  Additionally, the first line of the body of the email states: "*This email contains attorney-client privileged information in the form of advise* [sic] *from counsel to the board.*"  (Id. (emphasis in original).)  These after-the-fact measures and declarations, however, do not persuade the Court that Butler's email and report were, in actuality, intended *from the outset* to be protected by the attorney-client privilege.

---

[19]   The RCC Defendants claim that a copy of the report was provided to the Court by Plaintiff as an attachment to her Response to the Motion to Strike, but no such copy can be found on the docket.  (See generally doc. 98.)   The RCC Defendants claim the report was "clearly marked 'Attorney Client Privileged,'" (doc. 117, p. 2), but without having been provided a copy of the report, the Court cannot accept this as true.

(3)     **Whether Any Privilege has been Waived**

Regardless, even if Butler's email and report were subject to and protected by the attorney-client privilege when they were initially transmitted, the Court finds that such privilege was waived when Joyner-Barber forwarded them to Plaintiff, (see doc. 98-1); thus the at-issue references and excerpts need not be stricken from the Complaint.  As the Eleventh Circuit Court of Appeals has explained:

> The purpose of the attorney-client privilege is to promote freedom of consultation between client and lawyer by eliminating the fear of subsequent compelled legal disclosure of confidential communications.  However, at the point where attorney-client communications are no longer confidential, i.e., where there has been a disclosure of a privileged communication, there is no justification for retaining the privilege.  For that reason, it has long been held that once waived, the attorney-client privilege cannot be reasserted.

United States v. Suarez, 820 F.2d 1158, 1160 (11th Cir. 1987) (internal citations omitted); see also United States v. Pipkins, 528 F.2d 559, 563 (5th Cir. 1976) ("It is vital to a claim of privilege that the communication have been made *and maintained* in confidence.") (emphasis added).  The burden lies with the claimant of the privilege to prove that it has not been waived.  See United States v. Noriega, 917 F.2d 1543, 1550 (11th Cir. 1990).

In their initial brief in support of the Motion to Strike, the RCC Defendants argue that Plaintiff had "no lawful right of access" to the report or email and that "[t]he [RCC] has not consented to the public release of the contents of this report, and on information and belief neither the [RCC] [n]or Mr. Butler voluntarily provided Plaintiff with access to its contents."  (Doc. 54-1, p. 6.)  In their Reply brief, however, the RCC Defendants candidly admit that, when they filed the Motion to Strike, they were unaware that an RCC Board member had given Plaintiff a copy of the email and report.  (Doc. 117, p. 3.)  It was not until Plaintiff filed an unredacted copy of the forwarded email from Joyner-Barber that the RCC Defendants learned that Plaintiff obtained the materials directly from a Board member.  As a result, the RCC Defendants took up a new angle in

their Reply brief, arguing that Joyner-Barber's actions did not constitute a waiver of any attorney-client privilege.  (Id. at pp. 3–5.)

In support of their new theory, the RCC Defendants rely on a case from the United States District Court for the Eastern District of Pennsylvania, Sampson v. School District, 262 F.R.D. 469 (E.D. Pa. 2008).  In Sampson, the court held that a school board president's provision of a privileged memorandum (drafted by that board's attorney) to the plaintiff did not constitute a waiver of the privilege because the president did not have authority to act on behalf of the school district without the board's approval.  Id. at 478–79.  Critical to the Sampson court's decision was a Pennsylvania statute delineating the parameters of a school board president's authority to act on behalf of his or her school district.  Id.  The court relied heavily on language in the statute that explicitly restricted the president's authority to act in the absence of direction or approval of the board.  Id. at 479 (quoting and emphasizing language from Pennsylvania statute providing that the president, "*when directed by the board*, shall execute any and all deeds, contracts . . . and other papers" and that the president "*shall in no case*, except as this section otherwise provides, sign any order for any sum unless the same has first been acted upon and approved by the board . . . .") (emphasis added) (quoting 24 Pa. Stat. § 4–427 (2008)).

The RCC Defendants encourage this Court to reach the same conclusion: that Joyner-Barber did not have the authority to bind the RCC without the approval of the Board as a whole, meaning her actions should not be deemed an effective waiver of the attorney-client privilege.  (Doc. 117, pp. 3–5.)  Analogizing this case to Sampson, the RCC Defendants argue that "a non-profit corporation in Georgia is required to have a Board of Directors which 'all corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporate [sic] managed through.'"  (Doc. 117, pp. 4-5 (quoting O.C.G.A. § 14-3-801(a), (b)).)  From this, they

extrapolate that "[n]o individual Board member has the authority to act without the authority of the Board [and therefore] Ms. Joyner[-Barber]'s actions cannot bind the Rape Crisis Center." (Id.)

While the RCC Defendants are correct that subsection (a) of the O.C.G.A. § 14-3-801 requires nonprofit corporations to have a board of directors, they do not fully quote subsection (b) or accurately represent (or cite to) the rest of the statutory text. (See id.)  Subsection (b) provides, "*[e]xcept as provided in this chapter or subsection (c) of this Code section*, all corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board." O.C.G.A. § 14-3-801(b) (emphasis added).  Subsection (c), in turn, provides that "[n]o limitation upon the authority of the directors, whether contained in the articles of incorporation or bylaws, shall be effective against persons, other than members and directors, who are without actual knowledge of the limitation," and subsection (d), perhaps most notably, provides that

> [t]he articles may authorize a person or persons to exercise some or all of the powers which would otherwise be exercised by a board.  To the extent so authorized any such person or persons shall have the duties and responsibilities of the directors, and the directors shall be relieved to that extent from such duties and responsibilities.

Id. at § 14-3-801(c)–(d).  When considered in its entirety, the Georgia statute is patently dissimilar to the Pennsylvania statute in Sampson.  Not only does the Georgia statute lack any restrictions on an individual board member's authority to act unilaterally, it contrarily indicates in subsection (d) that an organization may, through its articles of incorporation, authorize a person to exercise some or all of the powers which would otherwise be exercised by the board.  Id.  The RCC Defendants do not cite to any legal authority or any documents governing the RCC's Board indicating that Joyner-Barber—who appears to have been the sole direct recipient of Butler's email and report— would not have had the authority to waive any applicable attorney-client privilege.

In light of the foregoing, the Court finds that the email and report were not protected by the attorney-client privilege but even if they were, any such privilege was waived when Joyner-Barber forwarded them both to Plaintiff.  As a result, the Court **DENIES** the RCC Defendants' Motion to Strike, (doc. 54).

## II.   Legal Standards Applicable to the Motions to Dismiss

### A.   Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Under a Rule 12(b)(6) motion to dismiss, a court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff."  Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009) (citation omitted).  "A complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010) (quoting Iqbal, 556 U.S. at 678).  "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action'" does not suffice.  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. (citation and internal quotations omitted).  While a court

must accept all factual allegations in a complaint as true, this tenet "is inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient.   Id.   Moreover, "unwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations."   Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1268 (11th Cir. 2009) (citing Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1248 (11th Cir. 2005)), *abrogated on other grounds by* Mohamad v. Palestinian Auth., 566 U.S. 449, 453 n.2 (2012).   Courts have adopted a two-pronged approach to apply these principles: (1) identify and eliminate any allegations in the complaint that are mere legal conclusions or wholly conclusory; and (2) "where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'"   ADA v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting Iqbal, 556 U.S. at 664); see Carruth v. Bentley, 942 F.3d 1047, 1056 (11th Cir. 2019) (disregarding abstract and conclusory allegations).

> ### B.    Initial Review of Plaintiff's Allegations

"[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."   Iqbal, 556 U.S. at 679.   Here, a number of Plaintiff's allegations "are pled at the highest order of abstraction and therefore must be disregarded."   Carruth, 942 F.3d at 1056.

The following allegations are stated in a wholly conclusory manner and thus will not be assumed to be true by the Court:

- "This was a collective conspiracy—instigated and led by the government—against Ms. Gibson-Carter in retaliation for being an African American woman in a position of power and for leveraging that position to engage her First Amendment rights, speaking truth in order to educate the community about the realistic status

of the diligence surrounding the prosecution of sexual assault offenders.  The ring leader was Defendant Meg Heap, . . . who stepped out of her prosecutorial role, to pressure other Defendants to collude in firing Ms. Gibson-Carter, who was Ms. Heap's public critic."  (Doc. 1, p. 3.)

- "Upon information and belief, [after Plaintiff spoke at the first city council meeting in December 2018,] Defendant Lumpkin, along with Defendant Meg Heap (District Attorney), decided that action needed to be taken against [Plaintiff] for exercising her First Amendment rights."  (Id. at p. 13.)

- "Upon information and belief, Defendants Lumpkin and . . . Heap wanted [an RCC] employee fired to make an example out of her and were upset by [Plaintiff's] insistence on handling the matter differently," and, thereafter, "[u]pon information and belief, Defendants Lumpkin and Heap attempted to make what should have been an internal personnel matter to be handled at [Plaintiff's] discretion a matter relevant to the DA's Office and the entire law enforcement agencies affiliated with the RCC."  (Id. at p. 19.)

- "The Board members were aware of Ms. Gibson-Carter's statements at the [City] Council meeting in December 2017[.]"  (Id. at p. 27.)

- "Upon information and belief, the Defendant RCC and the Defendant Board members terminated Ms. Gibbons-Carter [sic] because it [sic] feared retaliation from community partners."  (Id. at p. 32.)

These allegations are strikingly similar to those the Supreme Court disregarded in Iqbal.

556 U.S. at 680–81 (allegations that an individual was the "principal architect" of a policy or was

"instrumental" in adopting it were conclusory and not entitled to presumption of truth); see also

Carruth, 942 F.3d at 1056 (disregarding allegations that one defendant ordered an audit "[p]ursuant

to and in furtherance of the [d]efendants' scheme" and performed certain tasks while "acting at the

direction of" two other defendants because such allegations were "stated in a wholly conclusory

manner") (internal quotation marks omitted); McCullough v. Finley, 907 F.3d 1324, 1333–34

(11th Cir. 2018) (allegations that defendants "adopted" and "administered" an unlawful scheme

"at the highest level" were conclusory); Smith v. City of Sumiton, 578 F. App'x 933, 936–37 (11th

Cir. 2014) (per curiam) (allegations that defendants "were aware of" or "had knowledge of" an

individual's previous misconduct, without supporting factual allegations, were "conclusory" and

could not support a plausible claim that the defendants were aware of or knew about the individual's alleged prior conduct) (citing <u>Iqbal</u>, 556 U.S. at 678). Additionally, while allegations based "on information and belief" may generally be assumed true for purposes of a motion to dismiss, they are still subject to the pleading standards established under <u>Iqbal</u> and <u>Twombly</u>; here, those allegations are merely "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [which do] not suffice." <u>Iqbal</u>, 556 U.S. at 678. Accordingly, the Court declines to consider these allegations in analyzing whether Plaintiff has stated actionable claims.

Having disregarded the foregoing conclusory allegations, the Court assumes, unless otherwise noted, that the remaining factual allegations are true and now turns to determining whether those factual allegations "plausibly give rise to an entitlement to relief." <u>Iqbal</u>, 556 U.S. at 679.

## III.   The SCP Defendants' Motions to Dismiss

Defendants Ballard, Bryson, Jeffcoat, Libby, Lumpkin, Merriman, Revenew, Heap, Furey, and Grant-Robinson move for the dismissal of all claims asserted against them. (<u>See</u> docs. 27, 30, 41, 45, 85, 92.) In this Section, the Court only addresses Plaintiff's claims as they are asserted against these specific Defendants.[20]

### A.   Race Discrimination (Count II)

In Count II of her Complaint, Plaintiff asserts a claim for race discrimination pursuant to 42 U.S.C. § 1981. (Doc. 1.) In support of her race discrimination claim, Plaintiff alleges that she was qualified for her position as Executive Director and that race played a role in the decision to terminate her. (<u>Id.</u> at pp. 47–48.)

---

[20] Because SCP Defendants Branch and Rogers did not file motions to dismiss, this Order does not dispose of any claims against them.

Among the many statutes that combat racial discrimination, Section 1981 "protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 474 (2006) (quoting 42 U.S.C. § 1981(a)).  According to the Eleventh Circuit,

> To state a claim of race discrimination under § 1981, plaintiffs must allege facts establishing: (1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute.

Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1270 (11th Cir. 2004).

Although Plaintiff does not cite or reference 42 U.S.C. § 1983 in Count II of her Complaint, she asserts, in footnotes in her briefs in opposition to the SCP Defendants' Motions to Dismiss, that she "is not pursuing § 1981 claims under § 1981 against the SCP Defendants;" instead, she states that she only seeks to pursue her race discrimination claims against the SCP Defendants under Section 1983 because she is "mindful" that Section 1983 provides the sole cause of action against state actors for violations of Section 1981.[21]  (Doc. 69, p. 4 n.4; see also doc. 48, p. 5 n.1.) Plaintiff is correct that Section 1981 violations by state actors are only actionable under Section 1983.  See Butts v. County of Volusia, 222 F.3d 891 (11th Cir. 2000).  However, Plaintiff has not sought to amend her Complaint in order to properly assert her race discrimination claim against the SCP Defendants through Section 1983.  See Gibbons v. McBride, 124 F. Supp. 3d 1342, 1381 (S.D. Ga. 2015) ("A complaint may not be amended by briefs in opposition to a motion to dismiss.") (citing Huls v. Llabona, 437 F. App'x 830, 832 n.5 (11th Cir. 2011).)  This deficiency

---

[21]  The Court notes that Defendant Grant-Robinson—unlike the other SCP Defendants who have filed motions to dismiss—likely does not qualify as a "public official" (and thus cannot be held liable for Plaintiff's claims pursuant to Section 1983) because she works for a private, non-profit organization.  While Plaintiff offers arguments to the contrary, the Court declines to address this issue because—regardless of whether she was a state actor—all the claims against Grant-Robinson are subject to dismissal on the various other grounds discussed herein.

alone provides a sufficient ground for the dismissal of Count II against any SCP Defendants who are state actors.   Nonetheless, the Court analyzes whether Plaintiff has otherwise stated an actionable claim for race discrimination.

> **(1)     The Complaint does not Plausibly Allege that the SCP Defendants were Motivated by any Racially Discriminatory Animus**

Plaintiff's claim against the SCP Defendants in Count II is grounded in conjecture and lacks the factual specificity necessary to satisfy federal pleading standards.   While Plaintiff theorizes that the SCP Defendants were motivated by racial bias, she does not plausibly allege that these Defendants evinced any sort of racially discriminatory animus.

First, the Complaint is devoid of any allegations tending to show any racially discriminatory animus underlying the SCP Defendants' actions in drafting, signing, and sending the January 2018 letter.   The letter itself merely "complained of dissatisfaction" and asked for time to speak with the RCC Board because "important community relationships ha[d] become unnecessarily strained and less than productive."   (Doc. 1, p. 14.)   While Plaintiff does allege that Defendant Joyner-Barber told her that the letter was "racial," (id. at p. 44), this third-party assessment is far too vague and conclusory to "allow[] the [C]ourt to draw the reasonable inference" that the SCP Defendants were motivated by racial animus in sending the letter.   See Wooten, 626 F.3d at 1196.   Likewise, Butler's statement to the Board that "he believed 'there *could possibly be a racial element* involved in the challenges the RCC is facing,'" (doc. 1, p. 31 (emphasis added)), is vague and lacks the context necessary to plausibly support a claim of racial animus on the part of the SCP Defendants.   For instance, there is no explanation as to what the "racial element" was, how the racial element constituted discrimination or discriminatory animus, and who (if anyone) Butler observed to be demonstrating or engaging in this racial element.

Finally, the allegation that, "prior to [Plaintiff's] termination, [unspecified] Board members identified race as the primary motivation of the [unspecified] *community partners* wanting [Plaintiff] to be removed from her position as Executive Director," (id. at p. 43 (emphasis added)), is vague, conclusory and fails to specifically implicate any of the SCP Defendants (as opposed to other non-parties referenced throughout the Complaint).  As such, it is not "enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555; see also Iqbal, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Finally, none of the SCP Defendants other than Furey is alleged to have engaged in any activity concerning Plaintiff after sending the letter.  And while Furey is alleged to have attended the meeting and to have been "especially vocal" in calling for Plaintiff's termination, (doc. 1, p. 22), there is absolutely no indication from the Complaint that Furey's actions in attending and speaking at the meeting were motivated by racial animus.

> **(2)    The SCP Defendants were not Responsible for the Decision to Terminate Plaintiff**

Additionally, even assuming Plaintiff sufficiently alleged that the SCP Defendants harbored racial animus toward her, the race discrimination claim against them fails because, under the facts as alleged, they did not make the decision (or have the authority) to terminate her. Plaintiff admits that her termination was an "employment decision of the RCC and its Board," (doc. 48, p. 5), but claims that the SCP Defendants are nonetheless subject to liability for her termination based on Supreme Court precedent holding that "a State normally can be held responsible for a private decision . . . when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  (Id. (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)).)  In Blum v. Yaretsky,

the Supreme Court explained that the threshold for holding the State liable is high in order to "assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains."  457 U.S. at 1004.

Plaintiff argues that, here, the SCP Defendants "exercised extraordinary, will-imposing (coercive) power over the RCC and its Board when—after [Plaintiff's] public criticisms of the SCP—they threatened to cut off RCC's funding if the RCC and its Board did not defer to the SCP's demand to fire [Plaintiff]."  (Doc. 48, p. 6.)  In support, Plaintiff points to the comments made by non-party Gavin at the February 2018 meeting and the opinions stated by attorney Butler in an email to Plaintiff after he recommended her termination.  (See id. at pp. 6–7.)

The Court finds it prudent to closely review Gavin's alleged statement at the February 2018 meeting, as Plaintiff relies heavily on it to show that the SCP Defendants essentially forced the RCC and its Board to terminate Plaintiff.  According to Plaintiff's own allegations in the Complaint, Gavin—who is *not* alleged to have signed or otherwise been involved with the January 2018 letter—attended the February 2018 meeting with the RCC Board and stated that "the Savannah Police Department was in the process of pursuing grants to bring some of the RCC services in-house, effectively cutting RCC off from [a] majority of the victims it currently serves." (Doc. 1, p. 22.)  It is not clear whether the closing phrase of the allegation—the assessment that this change would "effectively cut[] [the] RCC off from [a] majority of the victims it currently serves"—was part of Gavin's own statement or is instead Plaintiff's personal commentary.  (See id.)  Regardless, Plaintiff has not alleged that Gavin intended this statement as a threat or delivered it in a threatening manner, such as for the purpose of leveraging Plaintiff's termination; indeed, as alleged, Gavin advised that this process was *already* underway (which gives no implication that it was contingent upon Plaintiff's employment status).  Additionally, and perhaps most importantly,

the Complaint does not indicate that any of the SCP Defendants approved of, adopted, relied upon, or even referred to this statement by Gavin in any way (much less in a way that would show racial animus or retaliatory motive).[22]  Indeed, Plaintiff has not alleged that any of the SCP Defendants other than Furey were present when Gavin made this statement.

Plaintiff, however, relies heavily on a gross mischaracterization of this statement by Gavin in her briefing.  On several occasions, Plaintiff brazenly attributes these comments to *all of the SCP Defendants* when, according to her own Complaint, they were made only by non-party Gavin and only with regard to the Savannah Police Department (which, like Gavin, is not a named party in this action).  She also mischaracterizes the statement as a threat used to leverage Plaintiff's termination.  (See, e.g., doc. 48, p. 6 ("*[T]he SCP Defendants . . . threatened* to cut off RCC's funding *if* the RCC and its Board did not defer to the SCP's *demand* to fire [Plaintiff].*") (emphases added).)  The Court rejects Plaintiff's efforts to re-characterize her own allegations as anything other than a straightforward statement attributable solely to a non-party individual (Gavin) spoken with regard to a single non-party entity (the Savannah Police Department).  Thus, contrary to Plaintiff's contentions, Gavin's statement does not clearly indicate that the SCP Defendants coerced or "so strongly encouraged" the RCC and its Board to terminate her that they should be held responsible for that act.

Similarly, in her briefing opposing dismissal, Plaintiff relies on a glaring mischaracterization of her own allegations about the letter Defendant Shea wrote shortly before her termination.  Citing her Complaint, Plaintiff asserts that, "[i]n April and May 2018, *the SCP Defendants demanded* that the RCC Board terminate [her] *in order to 'ensure the survival of the*

---

[22]  Additionally, there is no indication that Gavin's statement about taking services in-house was made due to animus against Plaintiff based on her race or in retaliation for her comments at the City Council meeting (or elsewhere).

*RCC* in its present state.'" (<u>Id.</u> at p. 10 (emphasis added) (citing doc. 1, pp. 31–32).)  The paragraphs of the Complaint that she cites to support this assertion state only that Shea drafted a letter directed to an unspecified recipient at "the Savannah Police Department," in which he: (1) declared that the RCC felt it had no option but to replace Plaintiff; (2) inquired whether it was still the intent to the Savannah Police Department to bring advocacy and/or "SANE services" in-house; and (3) inquired whether the recipient "continue[d] to require the termination of the RCC Executive Director in order to ensure the survival of the RCC in its present state . . . ." (Doc. 1, pp. 31–32.)  There are no allegations in these paragraphs, or elsewhere in the Complaint, indicating that anyone at the Savannah Police Department (much less *any SCP Defendant*) actually told the RCC and its Board that Plaintiff had to be fired in order to "ensure the survival" of the RCC in its present state.  Moreover, the Complaint explicitly alleges that Defendant Lumpkin, the only SCP Defendant who is alleged to have worked for the Savannah Police Department, was no longer with the department at the time Shea's letter was drafted.  (<u>Id.</u> at p. 36.)  Thus, it is not plausible that this letter would have been directed to him or in reference to any requirement being expressed or imposed by him.  As such, Plaintiffs' allegations simply fail to show coercion by the SCP Defendants such that the SCP Defendants should be held liable for the RCC and its Board's termination of Plaintiff.

Plaintiff also points to the impressions of attorney Butler, which he allegedly shared with her in an email explaining why he had recommended that she be terminated.  (Doc. 48, p. 7.)  Plaintiff attached a copy of the email to one of her briefs in opposition to dismissal.  (Doc. 48-1.)  This email, however, is not referenced at all in the Complaint and was not attached as an exhibit to the Complaint.  Generally, review of a Rule 12(b)(6) motion is limited "to the face of the complaint and attachments thereto," unless the additional evidence is referenced "in the complaint

and . . . central to the plaintiff's claim" and its contents are not in dispute.  Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1368 (11th Cir. 1997).  Plaintiff provides no basis for the Court to consider Butler's impressions contained in this particular email in ruling on the Motions to Dismiss.  As a result, the Court declines to consider the email or its contents.[23]

Notably, the one communication all of the SCP Defendants are alleged to have made to the RCC and its Board—the January 2018 letter—in no way suggested Plaintiff's termination and, as a result, lends no support to Plaintiff's theory that the SCP Defendants should be held responsible for the RCC and its Board members' decision to terminate her.  The only allegation even remotely connecting any of the SCP Defendants to Plaintiff's termination is the allegation that Furey attended the February 2018 meeting and was "especially vocal in her call for removal of [Plaintiff]."  (Doc. 1, p. 22.)  This allegation, however, does not plausibly indicate that Furey "exercised coercive power or . . . provided such significant encouragement [to the RCC Board] that the choice must in law be deemed to be that of [Furey]."  See Blum, 457 U.S. at 1004.  For instance, there is no allegation that Furey made any sort of threat or gave any sort of ultimatum to the Board on behalf of DFACS.

Finally, the Court cannot ignore the fact that, following the February 2018 meeting, the RCC and its Board hired attorney Butler to perform an independent review and investigation of the issues that had been raised.  (Doc. 1, p. 29.)  Butler recommended that Plaintiff be terminated. (Id.)  Thereafter, the RCC Board voted to terminate Plaintiff.  (Id. at p. 32.)  As such, both Butler

---

[23]  Moreover, even if the Court were willing to consider the statements by Butler in the at-issue email, there is no indication (from the email or from any other allegations in the Complaint) that they concerned or were in any way related to the SCP *Defendants*.  (See doc. 48-1, p. 1 ("*the community partners* have made it so that the board has no choice regarding your employment with the RCC") (emphasis added).)  As discussed elsewhere in this Order, there is no indication that any of the SCP Defendants were among the "community partners" interviewed by Butler and referenced in his report and emails.

and the RCC Board "sit in the middle of the causal chain allegedly running from [the specifically alleged actions of the SCP Defendants] to [Plaintiff's] injuries." Carruth, 942 F.3d at 1056.  While Butler allegedly explained that "[t]he community partners gave us no choice but to recommend that [Plaintiff's] employment be terminated," there is no indication from the Complaint that any of the *SCP Defendants* were among the community partners who "gave [Butler] no choice" but to recommend termination.  (Doc. 1, p. 29.)  Additionally, this is an extremely vague statement; Butler apparently provided scant factual support for his personal conclusion that he was given "no choice" but to recommend termination.

In light of the foregoing, Plaintiff has failed to allege facts plausibly showing that the SCP Defendants "can be held responsible for [the RCC Defendants'] private decision" to terminate Plaintiff because there is no indication from the Complaint that any of the SCP Defendants "exercised coercive power or . . . provided such significant encouragement, either overt or covert, that the choice [to terminate Plaintiff] must in law be deemed to be that of the [SCP Defendants]." Blum, 457 U.S. at 1004.

At most, the allegations in Plaintiff's Complaint show that the SCP Defendants were unhappy with certain decisions and errors that Plaintiff had made in operating the RCC, and that one of them (Furey) professed her opinion that Plaintiff should be removed from her position. They do not show anything more than a sheer possibility that any of the SCP Defendants discriminated against her based on her race.  In light of all the foregoing, the Court **DISMISSES** Plaintiff's claim in Count II against Defendants Ballard, Bryson, Jeffcoat, Libby, Lumpkin, Merriman, Revenew, Heap, Furey, and Grant-Robinson.

**B.**      **Violation of First Amendment Rights (Counts V and VI)**

In Counts V and VI of her Complaint, Plaintiff asserts claims for the violation of her First Amendment rights and for First Amendment retaliation, respectively.[24]  (Doc. 1, pp. 51–54.)  Both claims are asserted pursuant to Section 1983 and allege essentially the same thing: that Defendants were angered by Plaintiff's public comments and, as a result, took actions to silence her in violation of her First Amendment Rights.  (Id.)

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or . . . the right . . . to petition the government for a redress of grievances."  U.S. Const. Amend. I.  "The Amendment protects 'not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.'"  Echols v. Lawton, 913 F.3d 1313, 1320 (11th Cir. 2019) (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000)).  To state a viable Section 1983 claim, Plaintiff must show that she was deprived of a federal right—here, her First Amendment rights—and that the deprivation was caused by a person acting under color of state law.  Watkins v. Cent. Broward Reg'l Park, 799 F. App'x 659, 664 (11th Cir. 2020) (per curiam) (citing Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49–50 (1999)).  As to her First Amendment *retaliation* claim, Plaintiff must allege that she engaged in protected speech, that the defendant-official's conduct adversely affected the protected speech, and that a causal connection exists between the speech and the official's retaliatory conduct.  Bailey v. Wheeler, 843 F.3d 473, 480–81 (11th Cir. 2016).  "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness'

---

[24]  Relatedly, in Counts III and IV, Plaintiff alleges that all Defendants—motivated by retaliatory animus after her public criticism of some of them—conspired together to retaliate against her in violation of her First Amendment rights (pursuant to 42 U.S.C. §§ 1983 and 1985(3)).  These conspiracy claims are addressed as to all Defendants in Discussion Section IV, infra.

from the exercise of his First Amendment rights."  Bennett v. Hendrix, 423 F.3d 1247, 1254 (11th Cir. 2005) (citation omitted).

**(1)    Lack of Causal Connection Between the SCP Defendants' Conduct and Plaintiff's Speech**

After disregarding, as it must, the wholly conclusory allegations (as discussed in Discussion Section II.B, supra), the Court finds that Plaintiff's Complaint does not plausibly allege a connection between her speech and any conduct on the part of any of the SCP Defendants.[25]

While it is required for all Section 1983 claims, establishing a causal connection is particularly crucial to retaliation claims.  See Indigo Room, Inc. v. City of Ft. Myers, 589 F. App'x 938, 947 (11th Cir. 2014) (per curiam).  In the retaliation context, "[t]he causal-connection inquiry asks whether the defendants were subjectively motivated to retaliate because the plaintiff[ ] engaged in protected speech," and proof of subjective motivation "requires that the defendants had actual knowledge of the plaintiff['s] protected speech."  Id.; see Smith v. Fla. Dep't of Corr., 375 F. App'x 905, 911 (11th Cir. 2010) (per curiam) (To allege a causal connection, Plaintiff must identify "a sequence of events from which one could . . . plausibly infer a retaliatory motive."). Here, Plaintiff has not made this showing.

---

[25] Some of the parties dispute the first element: whether Plaintiff engaged in protected speech.  This dispute hinges on whether her role as Executive Director of the RCC made her a *public* employee (or some sort of quasi-public employee) who "by necessity must accept certain limitations on [their] freedom" of speech. Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services.").  Thus, some Defendants theorize, if Plaintiff were a public employee, she arguably would only have "engaged in protected speech" if she was retaliated against for speaking as a *citizen* on a matter of public concern.  Id.  Here, Plaintiff's allegations make clear that her at-issue speech (at the City Council meetings) was made in the capacity of her employment with RCC and not as a private citizen.  (See doc. 1, pp. 12–14, 26–28.)  The Court declines, however, to wade into the issue of whether the Executive Director of the RCC should be considered a public employee because Plaintiff's claim is subject to dismissal for her failure to satisfactorily plead the other necessary elements for a cause of action (which must be met regardless of whether she was a public, quasi-public or private employee).

39

First, Plaintiff does not allege that any SCP Defendants other than Lumpkin were present for—or were *ever* aware of—any of her statements at the December 2017 City Council meetings. Additionally, and most importantly, there are no allegations plausibly suggesting that any of the SCP Defendants, including Lumpkin,[26] cared about, much less were motivated to retaliate by, Plaintiff's statements at the City Council meetings (or any other public statement she may have made).  The Complaint is devoid of any indication that the letter from the SCP Defendants—sent "one month after [Plaintiff's] public statements"—said anything about Plaintiff or her comments. (Id. at p. 14.)  Per Plaintiff's allegations, the letter merely asked for time to speak with the RCC Board and "complained of dissatisfaction *but did not provide specifics* as to any perceived challenges or suggestions on how to solve them."  (Id. (emphasis added).)[27]

Even where the Complaint alleges specific actions by an individual SCP Defendant following Plaintiff's public comments, the allegations do not provide plausible grounds to infer that the at-issue SCP Defendant's actions were in any way related to Plaintiff's public speech or were meant to silence Plaintiff.  For instance, in an effort to show that Defendant Heap was upset by Plaintiff's statements at the first City Council meeting and sought to silence her, Plaintiff alleges that, shortly after that meeting, Heap "sat down with [Plaintiff] and communicated that she could be charged with a misdemeanor for neglecting to redact a [minor] child's [last] name from an email [she sent] in August 2017."  (Doc. 1, p. 13.)  Plaintiff admits that she was required to redact the

---

[26]  Plaintiff's conclusory allegation that Lumpkin and Heap "decided that action needed to be taken against [Plaintiff] for exercising her First Amendment rights" after Plaintiff spoke at the City Council meeting has already been disregarded by the Court pursuant to Iqbal, 556 U.S. at 680–81.  (See Discussion Section II.B, supra.)

[27]  Additionally, while the Complaint includes opinions that other individuals offered to Plaintiff regarding the community partners' motivations, none of these comments indicate that any of the SCP Defendants may have been upset about—or taken action motivated by—Plaintiff's December 2017 public statements.  There is also no indication from the Complaint that Butler perceived any potential issues or hostilities on the part of the "community partners" regarding Plaintiff's public speech, much less any efforts to silence her.

information and failed to do so and does not challenge the veracity of Heap's assertion that she could be charged with a misdemeanor for that failure; instead, Plaintiff emphasizes that this issue had not been raised by Heap in the four months since it occurred and was only raised by Heap following Plaintiff's City Council comments.  Notably, however, the Complaint indicates that Plaintiff had sent a letter to one of Heap's ADAs addressing the redaction issue in October 2017. (Doc. 1, pp. 13, 21.)  Thus, it is not as if all parties had been silent on the issue between its occurrence in August and Heap's comments to Plaintiff in December.

Additionally, there is no allegation that Heap addressed or referenced Plaintiff's recent City Council meeting statements during the at-issue conversation, much less that she threatened to criminally charge Plaintiff if she did not stop publicly criticizing Heap, her office, or her law enforcement affiliates.  Thus, even accepting Plaintiff's factual allegations as true, those allegations do not demonstrate that Defendant Heap "sat down with [Plaintiff]" and made this communication about criminal charges in order to intimidate Plaintiff from speaking out again. Rather, Plaintiff's allegations only create a "sheer possibility" of retaliation by Heap.  See Iqbal, 556 U.S. at 678 ("The plausibility standard . . .  asks for more than a sheer possibility that a defendant has acted unlawfully.").  It is equally possible that the timing of this meeting was coincidental, especially because Plaintiff does not allege that Heap was even aware at the time of the meeting of Plaintiff's comments at the City Council meeting.  Similarly, while Furey—unlike the other SCP Defendants—is alleged to have attended the February 2018 meeting and to have been "especially vocal" in calling for Plaintiff's termination, (doc. 1, p. 22), Plaintiff does not allege any facts showing that these actions were motivated by a desire to silence Plaintiff from speaking publicly or to retaliate against Plaintiff for her comments at the City Council meetings

(which, again, did not criticize the organization with which Furey is associated).  See Iqbal, 556 U.S. at 678.

To the contrary, Plaintiff's allegations provide other non-speech-related motivations for the letter and the requested meeting.  Plaintiff describes four of the "issues" and concerns that were addressed in the binder provided at the February 2018 meeting.  While Plaintiff's theory is that this binder was compiled in retaliation for her public criticism of some of the SCP Defendants, the allegations in the Complaint do not plausibly show that this was the case.  Plaintiff only describes four of the twenty-five complaints presented in the binder, but she does not deny that the events underlying at least some of those complaints actually occurred, nor does she deny that some of them related to ongoing disputes.  For instance, the issue with the RCC employee who had made disparaging comments to Savannah Police Department representatives had apparently been the subject of an ongoing disagreement between Plaintiff and Defendants Heap and Lumpkin (raised by Lumpkin just prior to Plaintiff's comments at the first City Council meeting), (doc. 1, pp. 19).  Moreover, there is no allegation that *any* of the issues presented in the binder had anything to do with Plaintiff's public speech and there is simply nothing in the Complaint showing "more than a sheer possibility," Iqbal, 556 U.S. at 678, that the binder was compiled in retaliation for her December 2017 public comments.

In sum, Plaintiff does not sufficiently allege that the SCP Defendants worked to silence her (in violation of the First Amendment rights)[28] or that her public comments in December 2017 motivated them to write and send the letter to the RCC Board.

[28]  Nothing in the Complaint plausibly indicates that the SCP Defendants actually did anything to deprive Plaintiff of her First Amendment rights (regardless of whether they were acting pursuant to a motive to retaliate against her for prior speech).  As discussed, the allegations that the Court is willing to consider show that the SCP Defendants sent a letter that said nothing about Plaintiff's speech to the RCC Board, and that thereafter SCP Defendant Furey (but no other SCP Defendants) attended a meeting with the RCC Board during which no one is alleged to have made any reference to Plaintiff's right to speak publicly.  The

(2)   **The SCP Defendants were not Responsible for the Decision to Terminate Plaintiff**

Additionally, even assuming Plaintiff has sufficiently alleged that the SCP Defendants actions were motivated by a desire to silence her, retaliate against her for speaking out, or otherwise violate her First Amendment rights, her First Amendment claims against them fail because, under the facts as alleged, they did not make the decision (or have the authority) to terminate her. The Court's reasoning for this determination is discussed at length in Discussion Section III.A(2), supra. Because there is no indication from the Complaint that any of the SCP Defendants "exercised coercive power or . . . provided such significant encouragement, either overt or covert, that the choice [to terminate Plaintiff] must in law be deemed to be that of the [SCP Defendants]," Blum, 457 U.S. at 1004, the SCP Defendants cannot be held responsible for the RCC Defendants' private decision to terminate Plaintiff in violation of her First Amendment rights.

The allegations in Plaintiff's Complaint show that the SCP Defendants were unhappy with certain decisions and errors that Plaintiff had made in operating the RCC and that one of them (Furey) professed her opinion that Plaintiff should be removed from her position. They do not show anything more than sheer possibility that any of the SCP Defendants' actions violated her First Amendment rights and exposed them to liability pursuant to Section 1983. In light of the foregoing, the Court **DISMISSES** Plaintiff's claims in Counts V and VI against Defendants Ballard, Bryson, Jeffcoat, Libby, Lumpkin, Merriman, Revenew, Heap, Furey, and Grant-Robinson.

---

Complaint simply does not allege any actions taken by any of the SCP Defendants with an aim to silence Plaintiff. Further, there is no indication that Plaintiff desired to speak publicly at some point but was prohibited, prevented or even dissuaded from doing so by the SCP Defendants or as a result of their conduct.

### C. Qualified Immunity as to Ballard, Bryson, Jeffcoat, Libby, Lumpkin, Merriman, Revenew, Heap and Furey

Defendants Ballard, Bryson, Jeffcoat, Libby, Lumpkin, Merriman and Revenew (police chiefs), Defendant Heap (district attorney), and Defendant Furey (Special Attorney General for DFACS) claim that, even if Plaintiff has stated viable claims against them, they are entitled to qualified immunity. (Doc. 27, pp. 18–24; doc. 30-1, pp. 19–23; doc. 41-1, pp. 19–21; doc. 45-1, pp. 24–25; doc. 92-1, pp. 15–17.)

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). The doctrine "is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012) (quotations and citations omitted). As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability and the other burdens of litigation, including discovery." Holmes v. Kucynda, 321 F.3d 1069, 1077 (11th Cir. 2003) (internal quotation marks omitted). But qualified immunity does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)) (internal quotation marks and alteration omitted).

To rely upon qualified immunity, a defendant first must show that he or she acted within his or her discretionary authority. Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1352

(11th Cir. 2015).  Specifically, a defendant must show that he "was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."  Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004).  "In determining whether a defendant performed a discretionary function, [the] inquiry is not whether the act complained of was done for an improper purpose, but 'whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.'"  Plotkin v. United States, 465 F. App'x 828, 831–32 (11th Cir. 2012) (quoting Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998)).  Here, Plaintiff does not appear to dispute that these Defendants were acting within their discretionary authorities as police chiefs, district attorney and special counsel for DFACS at all times relevant to this action, (see doc. 48, pp. 23–36), and the Court sees no basis to find otherwise.  Therefore, these Defendants may properly assert the defense of qualified immunity and the burden now shifts to Plaintiff to show that qualified immunity is not appropriate.  See Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

The Court must grant qualified immunity unless the facts taken in the light most favorable to a plaintiff show: (1) that there was a violation of the Constitution; and (2) that the illegality of the Defendants' actions was clearly established at the time of the incident.  Hoyt, 672 F.3d at 977. The Court has discretion in deciding which of those two prongs to address first.  Pearson v. Callahan, 555 U.S. 223, 236 (2009); see Morris v. Town of Lexington, Ala., 748 F.3d 1316, 1322 (11th Cir. 2014) ("A qualified-immunity inquiry can begin with either prong; neither is antecedent to the other.").  In cases where multiple defendants assert the defense of qualified immunity, the Court must assess qualified immunity "as it relates to [each defendant's] actions and omissions."  Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018); see Norris v. Williams, 776 F. App'x 619,

622 (11th Cir. 2019) (per curiam) (district court improperly "assumed that each [d]efendant participated in each alleged action" and did not consider individual actions). Here, Plaintiff alleges that Furey signed the letter *and* attended the meeting, while the other SCP Defendants are only alleged to have signed the letter; thus, Furey's actions will be considered separately.

Regardless of where a court begins its analysis, a plaintiff must demonstrate that the "contours of [a] right were clearly established" at the time of the alleged violation.  Terrell v. Smith, 668 F.3d 1244, 1255 (11th Cir. 2012).  The violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right. See Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).  This showing can be made in one of three ways.  First, the plaintiff may point to a "materially similar case [that] has already been decided" by the Supreme Court of the United States, the Eleventh Circuit Court of Appeals, or the highest court of the pertinent state, affirming the existence of the right and thereby providing fair notice that the at-issue conduct would constitute a violation of the at-issue right.  Loftus v. Clark-Moore, 690 F.3d 1200, 1204 (11th Cir. 2012); see also Waldron v. Spicher, 957 F.3d 1297, 1304 (11th Cir. 2020) ("This category consists of binding precedent tied to particularized facts in a materially similar case.").  Second, a plaintiff can also show that a broader, clearly established principle should control the novel facts of a particular case.  Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005).  "[T]he principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted."  Loftus, 690 F.3d at 1205 (alteration in original).  Put another way, "in the light of pre-existing law, the unlawfulness must be apparent."  Id.

Finally, a plaintiff may show that the alleged conduct of the officials was "so egregious that a constitutional right was clearly violated, even in the total absence of case law." Lewis v. City of West Palm Beach, 561 F.3d 1288, 1292 (11th Cir. 2009).  This third test is a narrow category encompassing those situations where "the official's conduct lies so very obviously at the very core of what the [relevant constitutional provision] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding lack of case law." Loftus, 690 F.3d at 1205 (alteration in original) (quoting Terrell, 668 F.3d at 1257).

As is relevant to this case, the Eleventh Circuit has found that "[i]t is particularly difficult to overcome the qualified immunity defense in the First Amendment context." Gaines v. Wardynski, 871 F.3d 1203, 1210 (11th Cir. 2017) (citing, inter alia, Maggio v. Sipple, 211 F.3d 1346, 1354 (11th Cir. 2000) ("'a defendant in a First Amendment suit will only rarely be on notice that his actions are unlawful'") (citation omitted)); see Hansen v. Soldenwagner, 19 F.3d 573, 576 (11th Cir. 1994) (observing that decisions in the First Amendment context "tilt strongly in favor of immunity" and only in the rarest of cases will it be found that a reasonable official should have known that he violated "clearly established" law).

For the reasons discussed throughout this Order, the Court finds that Plaintiff's Complaint fails to adequately plead any violations of her constitutional rights by these nine Defendants and thus fails to satisfy the first prong.  She has not alleged actionable claims for race discrimination, violation of her First Amendment rights (including retaliation), or conspiracy to violate any of her constitutional rights, (see Discussion Section IV, infra).  As a result, the Court focuses its analysis on the second prong—whether, even assuming arguendo that these nine Defendants violated the Constitution, Plaintiff has shown that the at-issue constitutional rights were clearly established at the time Defendants committed the alleged violations.

Here, Plaintiff has failed to meet this burden; in her responsive briefing, she cites to numerous cases that she claims clearly established that it was unconstitutional for these nine Defendants to: (1) retaliate against her for publicly criticizing their investigatory and prosecutorial work, particularly because "she was terminated as a result of [their] retaliation;" (2) take actions to have her terminated where said actions were "motivated—at least in part—by [her] race;" and (3) unlawfully and coercively conspire to retaliate against her "based on her public criticism of their work, using race as a motivating factor," to have her terminated.  (Doc. 48, pp. 25–26.) However, she neglects to provide any meaningful analysis of any of the cited cases and she never attempts to analogize any of them to the case at hand.  The Court is charged with "consider[ing] the official's conduct in 'the specific context of the case,' not as 'broad general propositions.'" Echols, 913 F.3d at 1323–24 (quoting Bailey, 843 F.3d at 484); see also Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality.").  Simply put, Plaintiff's briefing frames her claims too broadly for purposes of the "clearly established" inquiry.

Even if Plaintiff had attempted to discuss them, however, her cited cases are inapposite to the case at hand.  See, e.g., Ricci v. DeStefano, 557 U.S. 557, 558 (2009) (city's refusal to certify results of firefighters' promotional examinations, based on city's belief that its use of results could have disparate impact on minority firefighters, was violation of Title VII's disparate-treatment prohibition); Hartman, 547 U.S. at 256 (First Amendment prohibits government officials from subjecting (or urging prosecutors to subject) individuals to criminal prosecution in retaliation for speaking out); Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003) (analyzing claim that employer refused to rehire plaintiff due to his record of past drug addiction or his perceived drug addiction disability in violation of the Americans with Disabilities Act); Bennett, 423 F.3d at 1256 (clearly

established that "prolonged and organized campaign of harassment by local police officers" in retaliation for plaintiffs' speech violates First Amendment rights).  None of the cited cases would have put these nine Defendants on notice that their conduct—writing a letter to the board of a nonprofit organization with which they are in a "community partnership," alerting that board of concerns about their working relationship and asking for a meeting to discuss issues—would violate the First Amendment rights of the organization's director or would constitute racial discrimination against the organization's director.[29]  Likewise, none of these cases would have put Defendant Furey on notice that, after signing that letter, she would violate the Constitution by attending a meeting where more than twenty-five non-race-related and non-speech-related complaints against the director were presented and by calling for the removal of the director during that meeting.  Additionally, the Court is not willing to say that "the conduct involved in the case . . . so obviously violate[d] the Constitution that prior case law is unnecessary."  Loftus, 690 F.3d at 1205.

"Because the Constitution's general provisions can be abstract, fair notice protects an official from liability for conduct that he could reasonably believe was lawful."  Echols, 913 F.3d at 1325 (internal citations, quotation marks, and alterations omitted).  Even assuming Plaintiff's well-pleaded allegations as true, the Court simply cannot say that the law provided any of these nine Defendants with fair notice that their actions would violate Plaintiff's constitutional rights.  As a result, Plaintiff fails to meet her burden of showing that these nine Defendants violated a clearly-established constitutional right; accordingly, Defendants Ballard, Bryson, Jeffcoat, Libby,

---

[29]  Contrary to the way Plaintiff framed the alleged constitutional violations for purposes of the qualified immunity inquiry, her Complaint does not indicate that any of the SCP Defendants suggested, requested, or otherwise sought her termination in sending the letter.  (See doc. 48, pp. 25–26; see also doc. 1.)  The Complaint also lacks any allegations regarding the letter's contents in relation to Plaintiff's race or public comments.  (See doc. 1.)

Lumpkin, Merriman, Revenew, Heap, and Furey are entitled to qualified immunity on all Counts of the Complaint asserted against them.

## IV.   Conspiracy Claims against All Defendants (Counts III and IV)

In Counts III and IV of her Complaint, Plaintiff asserts conspiracy claims against all Defendants pursuant to Section 1983 and 42 U.S.C. § 1985(3), respectively.  (Doc. 1, pp. 48–51.) Plaintiff alleges identical theories for both claims, stating that Defendants violated both statutes when they, "motivated by retaliatory animus, because of her public statements against [them]," conspired against her and infringed on her First Amendment rights by "prohibit[ing] [her] from further [offering] public criticism of [their] deficiencies," by "telling her that she could not speak publicly in the manner that she had done at City Council meeting[s]," and by terminating her employment.  (Id.)

In order to state a viable conspiracy claim, a complaint generally must contain more than vague and conclusory accusations.  See Twombly, 550 U.S. at 556–57; Fullman v. Graddick, 739 F.2d 553, 556–57 (11th Cir. 1984).  "It is not enough to simply aver in the complaint that a conspiracy existed."  Id. at 557.  Instead, the complaint must contain "enough factual matter (taken as true) to suggest than an [illegal] agreement was made."  Twombly, 550 U.S. at 556; see also Kearson v. S. Bell Tel. & Tel. Co., 763 F.2d 405, 407 (11th Cir. 1985) (where plaintiff merely alleges "conclusory, vague, and general allegations of conspiracy," dismissal of the conspiracy claim may be proper).  "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  Twombly, 550 U.S. at 557.

### A.    Intracorporate Conspiracy Doctrine

As an initial matter, Plaintiff's Complaint, which is by no means a paragon of clarity, does not make clear exactly which Defendants she claims conspired together to violate her constitutional rights.  However, if and to the extent Plaintiff seeks to proceed on a theory that the Board Defendants conspired solely amongst themselves and/or with the RCC to deprive her of her First Amendment rights, the Court finds that the intracorporate conspiracy doctrine bars any such claim under both Section 1983 and Section 1985(3).  Under the intracorporate conspiracy doctrine, a corporation's officers, directors or employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation.  Dickerson v. Alachua County Comm'n, 200 F.3d 761, 767 (11th Cir. 2000) ("The intracorporate conspiracy doctrine applies to both private corporations and public, government entities.").  Here, the RCC and its Board members (as agents of the RCC) constitute a "single legal entity" and, thus, are not "capable of conspiring" together.[30]  Id. at 767–68.  Therefore, Plaintiff cannot demonstrate that at least two people conspired together, as required to state a conspiracy claim against solely the Board Defendants and/or the RCC.

The Complaint appears, however, to allege a conspiracy that included the SCP Defendants. The Court thus turns to addressing whether Plaintiff has sufficiently pled the necessary elements for each of the two conspiracy-related counts.

---

[30]  The intracorporate conspiracy doctrine may not bar a plaintiff's claim where (1) the participants' conduct violates the federal criminal code, McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1034 (11th Cir. 2000); (2) "the employee has an 'independent personal stake' in his unconstitutional acts and is not acting to further the corporation's illegal objective," Grider v. City of Auburn, Ala., 618 F.3d 1240, 1262 (11th Cir. 2010); and (3) "the employees 'engage in a series of discriminatory acts as opposed to a single action' over a significant period of time in the employment setting," id. (quoting Dickerson, 200 F.3d at 768–70). None of these exceptions has been shown to be relevant in this case.

B.      42 U.S.C. § 1983 Conspiracy (Count III)

To plead a Section 1983 conspiracy claim, a plaintiff must plausibly allege: (1) the defendants reached an understanding or agreement that they would deny the plaintiff one of her constitutional rights; (2) the conspiracy resulted in an actual denial of one of her constitutional rights; and (3) the defendants were acting under color of state law in doing so.  Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1327 (11th Cir. 2015).  Construing her Complaint liberally, Plaintiff claims that the Defendants conspired together to deny her the right to publicly criticize them by intimidating her and telling her she could not speak publicly and by terminating her.  Defendants argue that the claim fails due to a lack of factual allegations tending to show all of the necessary elements.  All Defendants argue that Plaintiff has failed to allege facts tending to show that they reached an understanding or agreement to deny her one or more of her constitutional rights, as required for the first element.  As to the second and third elements, the Defendants present interrelated arguments.  All but one of the SCP Defendants[31] admit that they would have been acting under color of state law in satisfaction of the third element; however, they argue that the second element has not been met because none of the allegations indicate that they ever prohibited Plaintiff from engaging in further public speech or criticism and because they did not have the authority to terminate her.  (See, e.g., doc. 30-1, pp. 17–19.)  The Board Defendants, the RCC, and Grant-Robinson argue that Plaintiff cannot satisfy the third element because they are not state officials and, thus, they were not acting under color of state law in terminating her.  (Docs. 55–67, 85.)  In response, Plaintiff argues that the RCC and the Board Defendants should be deemed state actors under the "public function test" and also that the RCC, its Board members and Grant-Robinson can all be considered state actors and held liable for said conspiracy under the "state

---

[31]  Defendant Grant-Robinson denies that she would have been acting under color of law.

compulsion test" because Plaintiff's termination by the RCC and its Board (and Grant-Robinson's participation in the conspiracy) resulted from "acts of coercive power" committed by the SCP Defendants.  (Doc. 48, p. 19; doc. 97, pp. 25–30.)

### (1)    Lack of an Understanding or Agreement to Violate Plaintiff's Rights

First and foremost, the Complaint is fatally devoid of factual allegations showing communications between any of the Defendants whereby an understanding or agreement was reached to deny Plaintiff her constitutional rights.  See Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., 956 F.2d 1112, 1122 (11th Cir. 1992) (the "linchpin for conspiracy is agreement, which presupposes communication").  The closest Plaintiff comes to satisfying this element is her allegation that, "[u]pon information and belief, Defendant Lumpkin, along with Defendant Meg Heap (District Attorney), decided that action needed to be taken against [Plaintiff] for exercising her First Amendment rights."  (Doc. 1, p. 13.)  As discussed in Discussion Section II.B, supra, this allegation is not subject to consideration by the Court.  Even if it were subject to consideration, however, it does not actually allege that Lumpkin and Heap *communicated* with each other in reaching the alleged conclusion, much less that they reached an *agreement* to take action against Plaintiff.  And while there necessarily would have been some sort of communication amongst the SCP Defendants (as they all signed the same letter), nothing about the letter's contents (as described and quoted in the Complaint) indicates that they had reached an understanding or agreement to deny Plaintiff her constitutional rights.  Further, the Complaint contains no factual allegations indicating such an agreement was reached between or amongst any of the SCP Defendants.  (See, e.g., id. at p. 37 (alleging that "Defendant Bryson told [Plaintiff] that the letter was sent to him by . . . Heap, and that he did not even read it prior to signing," but neglecting to allege any facts indicating that Heap sent it pursuant to an understanding or agreement to deny

Plaintiff her constitutional rights) (emphasis omitted); id. at p. 45 (alleging that "Defendant Rose Grant-Robinson, the only African American community partner, told [Plaintiff] that she felt pressured into signing the letter of concern," but failing to allege any facts indicating the pressure came from another Defendant, much less that there was some underlying agreement or plan to deny Plaintiff her constitutional rights).)

Plaintiff alleges even scanter facts tending to show any such agreement between the SCP Defendants, the RCC, and the Board Defendants. Indeed, the existing factual allegations tend to cut against any such indication, given that, following the February 2018 meeting, the Board hired Butler to independently investigate the complaints and issues presented at the meeting. In sum, Plaintiff has not pled sufficient facts to "raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." Twombly, 550 U.S. at 557.

### (2)    Failure to Satisfy the "Under Color of Law" Requirement

Additionally, Plaintiff fails to satisfy the "under color of law" requirement. First, there is no indication that Plaintiff was silenced or prohibited from speaking publicly prior to her termination by *any* of the Defendants (including those SCP Defendants who admit that they would have been acting under color of law). Next, because the SCP Defendants undisputedly did not employ Plaintiff, they therefore did not terminate her. Thus, her termination can only be said to have been "under color of law" if the RCC Defendants were acting under color of state law pursuant to either of the tests propounded by Plaintiff. As to the first test, the Court is not persuaded that "acts of coercive power" by the SCP Defendants (who were acting under color of law) resulted in the RCC and its Board's decision to terminate Plaintiff. There was nothing coercive about the SCP Defendants' letter as it is described in the Complaint, and even Furey's "call[] for" Plaintiff's removal cannot be said to have been an act of coercive power, as there is no

allegation that Furey included any sort of ultimatum or threat against the RCC on behalf of her client.  (See also Discussion III.A(2), supra.)

As for the second test (the "public function" test), Plaintiff has failed to plead sufficient facts to plausibly satisfy this test.  The public function test limits state action to "instances where private actors are performing functions traditionally the exclusive prerogative of the state."  Focus on the Family, 344 F.3d at 1277 (quoting Willis v. Univ. Health Servs., Inc., 993 F.2d 837, 840 (11th Cir. 1993)).  Plaintiff has not pointed the Court to any legal authority whereby a nonprofit corporation analogous to the RCC has been deemed to meet this standard.  Instead, Plaintiff cites exclusively to cases from courts (in other states) holding that foster care agencies perform a state function because they care for and handle placement of children who are, in effect, wards of the state.  (Doc. 97, pp. 26–27.)  There is no indication that advocacy on behalf of sexual assault victims is "traditionally the exclusive prerogative of the state" in Georgia.  Focus on the Family, 344 F.3d at 1277.  In trying to meet this requirement, Plaintiff's brief focuses heavily on the fact that the RCC receives funding from the CJCC, which it claims is a state agency.[32]  (Doc. 97, p. 26.)  Notably, however, the Complaint alleges that, in addition to being funded by the CJCC (and the City of Savannah and Chatham County), the RCC is funded in part by the United Way of the Coastal Empire.  (Doc. 1, p. 5.)  The Complaint also explains that one of Plaintiff's duties at the RCC was "fundraising" and maintaining relationships with "funders," (doc. 1, pp. 33), undermining Plaintiff's argument that the RCC is funded by the CJCC "to provide the services

---

[32]  The CJCC is "a state-wide *coordinating body* which represents all components and all levels of the criminal justice system."  O.C.G.A. § 35-6A-1 (emphasis added).  It was established "to coordinate the major components of the criminal justice system" so that "criminal justice efforts [may] be better coordinated, intensified, and made more effective in all components of the system and at all levels of government" in Georgia.  Id.  It "is assigned to the Georgia Bureau of Investigation for administrative purposes."  Id. at § 35-6A-2.

[the CJCC] was tasked to [provide] by the legislature to the community," (doc. 97, p. 26). While the CJCC is statutorily vested with the authority "[t]o administer gifts, grants, and donations for the purpose of carrying out this chapter" and "[t]o promulgate rules governing the *approval of victim assistance programs*," O.C.G.A. § 35-6A-7 (emphasis added), Plaintiff has not pointed the Court to any Georgia statute or other legal authority whereby the CJCC was tasked with the actual provision of the types of services that are being provided by the RCC. The Complaint additionally alleges that advocacy on behalf of victims with regard to relevant local, state and federal policies is part of the RCC's work. (Doc. 1, pp. 26, 33.) It would not make sense to say that an organization that actively works to *influence* state policies (in effect, lobbying) is performing a function that is traditionally the prerogative of the state. As a result, the Court is not persuaded that the RCC and the Board Defendants should be considered state actors under the public function test. Accordingly, the Court finds that Plaintiff has failed to satisfy the second and third elements of a conspiracy claim against the Defendants under Section 1983.

Finally, although Count Three is allegedly asserted against all Defendants, the majority of the allegations within the Count are worded as if it is asserted only against the SCP Defendants. Even assuming that Plaintiff has sufficiently pled that the SCP Defendants conspired only amongst themselves, under color of law, to deny her one of her constitutional rights, her conspiracy claim nonetheless fails against them because she has not sufficiently alleged that any conspiracy amongst them resulted in an actual denial of one of her constitutional rights. As explained above, the SCP Defendants did not make the decision (or even allegedly have the authority) to terminate her and there are no factual allegations indicating that they somehow prohibited her from exercising her right to speak publicly. Even Plaintiff's claim that they intimidated her from speaking publicly is not supported by her factual allegations. The January 2018 letter made no reference to her public

comments and criticisms, and there is no allegation that Furey (the only SCP Defendant who allegedly attended the February 2018 meeting) made any reference to Plaintiff's public speech during the meeting (which, according to the Complaint, Plaintiff did not attend).

In light of the foregoing, Plaintiff fails to state a claim for conspiracy pursuant to Section 1983 against any of the movants and the Court therefore **DISMISSES** Count III as to Defendants Furey, Ballard, Bryson, Jeffcoat, Lumpkin, Libby, Revenew, Heap, Grant-Robinson, Merriman, Booth, Wolf, Camacho, Clark, Douglas, Fritz-Tanner, Hogan, Hughes, Joyner-Barber, Lundy, Roberts, Shea and the RCC.

### C.     42 U.S.C. § 1985(3) Conspiracy Claim (Count IV)

To make out a claim under the first clause of 42 U.S.C. § 1985(3)—the only clause potentially applicable here—a plaintiff must allege:

> (1) defendants engaged in a conspiracy; (2) the conspiracy's purpose was to directly or indirectly deprive a protected person or class the equal protection of the laws, or equal privileges and immunities under the laws; (3) a conspirator committed an act to further the conspiracy; and (4) as a result, the plaintiff suffered injury to either his person or his property, or was deprived of a right or privilege of a citizen of the United States.

Jimenez v. Wellstar Health Sys., 596 F.3d 1304, 1312 (11th Cir. 2010) (citing Johnson v. City of Ft. Lauderdale, 126 F.3d 1372, 1379 (11th Cir. 1997)).  Additionally, the analysis of a Section 1985(3) conspiracy claim requires the consideration of two somewhat nuanced but important factors that are particularly relevant here.  First, "an alleged conspiracy to infringe First Amendment rights is not a violation of § 1985(3) unless it is proved that the State is involved in the conspiracy or the aim of the conspiracy is to influence the activity of the State."  United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott, 463 U.S. 825, 830 (1983); see also Jimenez, 596 F.3d at 1312 ("[T]he Supreme Court has declared the freedom of speech . . . insufficient to form the basis of § 1985(3) actions against private conspirators.").  Additionally,

"[t]he second element [of a prima facie case] requires a showing of some 'racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" Childree v. UAP/GA CHEM, Inc., 92 F.3d 1140, 1147 (11th Cir. 1996) (citation and some punctuation omitted).

The first and second elements have not been sufficiently pled as to all Defendants for the same reasons described in the prior subsection concerning the Section 1983 conspiracy claim. In short, the Complaint is devoid of factual allegations plausibly showing a conspiracy of two or more Defendants with the purpose of depriving Plaintiff of equal protection of the laws or of equal privilege and immunities under the laws. The Complaint is additionally deficient specifically as to the second element because it fails to sufficiently allege a discriminatory animus "lay[ing] behind the conspirators' action." See Jones v. CitiMortgage, Inc., 666 F. App'x 766, 773 (11th Cir. 2016) (per curiam) (plaintiff failed to state a claim for relief under Section 1985(3) because, "[a]mong other problems, his allegations are insufficient to show the existence of a conspiracy that was premised on any racial or class-based animus"). The lack of racially discriminatory animus on the part of the SCP Defendants has been established and discussed at length in Discussion Section III.A(1), supra. As to the RCC and the Board Defendants, Plaintiff has pled nothing more than conclusory assertions and opinions offered by some Board members about the motives of others; the allegations are insufficient to plausibly indicate that the RCC or its Board members themselves harbored an invidiously discriminatory animus such that they conspired amongst themselves to terminate or otherwise quiet Plaintiff because she was African American. (See doc. 1.) Moreover, the Section 1985(3) claim fails due to the lack of sufficient allegations of an agreement between or amongst two or more of the RCC and/or the Board Defendants to silence Plaintiff or to otherwise violate her free speech rights.

Finally, even assuming the SCP Defendants had entered into a conspiracy amongst themselves, the third element is not satisfied as to their conspiracy because the Complaint is devoid of allegations plausibly showing an act by any of them in furtherance of the conspiracy, as all but Defendant Furey did nothing more than sign and send a letter expressing concern about the RCC and asking for a meeting, and even Furey, by Plaintiff's own terms, merely made a "vocal . . . call"—on grounds not specified in the Complaint—for Plaintiff to be removed from her position. (Doc. 1, p. 22.)

In light of the foregoing, Plaintiff fails to state a claim for a conspiracy under Section 1985(3) against any of the movants and the Court therefore **DISMISSES** Count IV as to Defendants Furey, Ballard, Bryson, Jeffcoat, Lumpkin, Libby, Revenew, Heap, Grant-Robinson, Merriman, Booth, Wolf, Camacho, Clark, Douglas, Fritz-Tanner, Hogan, Hughes, Joyner-Barber, Lundy, Roberts, Shea and the RCC.

## V.     The RCC Defendants' Motions to Dismiss

The RCC, (doc. 55), and each of the Board Defendants, members of the RCC's Board of Directors (Booth, Camacho, Clark, Douglas, Fritz-Tanner, Hogan, Hughes, Joyner-Barber, Lundy, Roberts, Shea and Wolf), (docs. 56–67), have filed separate Motions to Dismiss.  Because the relevant factual allegations and necessary analyses for these Defendants largely overlap, the Court examines them contemporaneously below.

### A.     Race Discrimination (Counts I and II)

In Count I of her Complaint, Plaintiff alleges that, by terminating her employment, the RCC discriminated against her on the basis of race in violation of Title VII, 42 U.S.C. § 2000.  In Count II of her Complaint, she alleges that both the RCC and the Board Defendants discriminated against her on the basis of race in violation of 42 U.S.C. § 1981.  (Doc. 1, pp. 46–48.)  Specifically,

she alleges that she was terminated by the RCC, despite being qualified for her position, at least in part because she is African American.  (Id.)  She asserts that "[o]f the 25 Board members and community partners, only 2 are African American; the rest are Caucasian."  (Id. at p. 46.)  She also urges that "Defendant Board members claim[ed] that race played a role [in] the attack on [her] that led to her termination . . . ."  (Id. at pp. 46–48.)

Title VII, in relevant part, forbids covered employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e–2(a)(1).  "To state a claim of race discrimination under § 1981, plaintiffs must allege facts establishing: (1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute." Jackson, 372 F.3d at 1270.  Because Section 1981 employs "the same analytical framework" as Title VII discrimination claims, the Court addresses the sufficiency of Counts I and II contemporaneously.  Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009); see also Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").

While Title VII claims apply only to employers, see Dearth v. Collins, 441 F.3d 931, 933 (11th Cir. 2006), an individual defendant can be held personally liable under Section 1981.[33]  See

---

[33]  The Board Defendants urge that they are shielded from individual liability pursuant to Georgia's "corporate veil" doctrine.  (See, e.g., doc. 56-1, pp. 10–11; see also doc. 118, pp. 7–13.)  Critically, however, they have not directed the Court to any case law applying the doctrine to shield members of a board of directors from liability in a case with factual allegations and causes of action similar to those alleged here. Even assuming the doctrine applies in some contexts to protect the members of a corporation's board of directors, the Court is not persuaded that it shields the Board Defendants based on the claims and arguments

Faraca v. Clements, 506 F.2d 956, 959–60 (5th Cir. 1975) (affirming judgment holding director of the Georgia Retardation Center individually liable for discrimination under Section 1981); see also Al–Khazraji v. St. Francis Coll., 784 F.2d 505, 518 (3d Cir. 1986) (if they authorize, direct, or participate in discriminatory conduct or if they are personally involved in discrimination against a plaintiff, "directors . . . of a corporation may become personally liable when they intentionally cause an infringement of rights protected by Section 1981, regardless of whether the corporation may also be held liable"), *cert. granted in part and aff'd*, 481 U.S. 604 (1987); Tillman v. Wheaton–Haven Recreation Ass'n, 517 F.2d 1141, 1146 (4th Cir. 1975) (holding that directors become personally liable when they intentionally cause a corporation to infringe the rights secured by Section 1981).

"A complaint in an employment discrimination case need not contain specific facts establishing a prima facie case under the evidentiary framework for such cases to survive a motion to dismiss." Henderson, 436 F. App'x at 937 (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, (2002)). Rather, "complaints alleging discrimination . . . must meet the 'plausibility standard' of Twombly and Iqbal." Id. Thus, to survive a motion to dismiss, Plaintiff does not have to establish a prima facie case of discrimination but must "provide enough factual matter (taken as true) to suggest intentional race discrimination." Davis v. Coca–Cola Bottling Co. Consol., 516 F.3d 955,

---

presented in this case. Clearly-established Georgia case law declares that, "[o]ne who is sued in his personal capacity, whether the alter ego, an officer or agent of a corporation, may not escape personal liability for his tortious misconduct damaging employees or third persons by hiding behind the corporate veil even in those situations where the corporation might also be a proper party to the action." Wrigley v. Nottingham, 141 S.E.2d 859, 861 (Ga. Ct. App. 1965), *rev'd on other grounds by* Nottingham v. Wrigley, 144 S.E.2d 749 (Ga. 1965); see also Moore v. Barge, 436 S.E.2d 746, 749 (Ga. Ct. App. 1993) ("Although shareholders or officers in a corporation enjoy a limited liability, they may be held liable individually for their own tortious or wrongful acts."). The Board Defendants are individually accused of terminating an employee based, at least in part, on racially discriminatory animus, which—if true—certainly would seem to qualify as a wrongful act.

974 (11th Cir. 2008) (internal quotation marks omitted); see also Andrews v. City of Hartford, 700

F. App'x 924, 926 (11th Cir. 2017) (per curiam) ("[A] complaint must allege sufficient facts to

allow the court to draw the reasonable inference that the employer engaged in discrimination.");

Castillo v. Allegro Resort Mktg., 603 F. App'x 913, 917 (11th Cir. 2015) (per curiam) (same).

After carefully reviewing Plaintiff's factual allegations relating in any way to race, the

Court finds that she plausibly alleges that the RCC and the Board Defendants discriminated against

her on the basis of race in terminating her from her position as Executive Director.  This

determination is based on some or all of the following allegations:

- A Caucasian Board member told Ms. Gibson-Carter that the January 2018 letter was "racial" and recommended that Plaintiff "hire a Caucasian female assistant to smooth over the differences with the community partners."  (Doc. 1, p. 44.)

- One Board member (who is African American) said she "felt like the February 2018 meeting was racially motivated."  (Id. at p. 23.)

- Another Caucasian Board member said (at an undisclosed time and to an undisclosed audience) that "cultural differences" were the reason for issues with Plaintiff.  (Id. at p. 44.)

- Another Caucasian Board member "asked what 'color' attorney the Board retained to investigate the allegations against [Plaintiff]."  (Id.)

- All but one of the RCC Board members are Caucasian.  (Id. at p. 45.)

- Attorney Butler did not interview the one member of the RCC Board who is African American.  (Id.)

- In providing his final report to the RCC, Butler stated that "[t]he community partners gave us no choice but to recommend that [Plaintiff's] employment be terminated."  (Id. at p. 29 (emphasis omitted).)

- When Butler and an African American colleague met with some unspecified "community partners," several of those unnamed individuals were "overtly dismissive" of Butler's colleague and "simply rude" to both Butler and the colleague, and one unnamed individual would not shake the colleague's hand and "completely ignored" both Butler and his colleague.  (Id. at pp. 30–31.)

- Butler's report to the Board noted that "he believed 'there could possibly be a racial element involved in the challenges the RCC is facing.'"  (Id. at p. 31.)

These allegations indicate that at least some Board Defendants suspected that some or all of the individuals who signed the January 2018 letter and/or some or all of the individuals who participated in the February 2018 meeting were motivated by racial animus against Plaintiff.[34]  The Complaint indicates that the RCC Defendants did not simply capitulate to those individuals' desires and instead hired Butler to investigate the issues that had been presented in the letter and at the meeting.  However, Butler ultimately notified the Board members of his own concerns about a possible "racial element" and he described how some of the community partners exhibited what could be considered racist behavior.  This phrase "racial element" is admittedly vague and there may be non-discriminatory explanations for the community partners' behavior at the meeting with Butler and his colleague.  Nonetheless, these allegations create at least a plausibility that the RCC (through the votes of the Board members) terminated Plaintiff knowing that some of the "community partners"—who Butler said "gave [him] no choice but to recommend" termination— were acting with racially discriminatory intent.  "At a minimum, these allegations could, through discovery, yield circumstantial evidence of intentional discrimination." Castillo, 603 F. App'x at 919 (rejecting district court's conclusion that a supervisor's alleged statement to Plaintiff that he wanted to give the plaintiff's job to a "young boy" was amenable to multiple interpretations and, therefore, could not support a Title VII claim).

While it may be that neither Butler nor the Board Defendants based their decisions about terminating Plaintiff on any personally-harbored racially discriminatory animus, the Complaint indicates that Butler informed the Board that his termination recommendation was based on the

---

[34]  For the reasons previously described herein, the Court determined that the Complaint does not contain factual allegations to justify such concerns or suspicions with regard to the SCP Defendants.  Nonetheless, the Court accepts as true Plaintiff's allegations that some Board members told her they had these kinds of perceptions or suspicions.

community partners having given him "no choice" to recommend otherwise and he specifically noted concerns that a "racial element [was] involved in the challenges the RCC [was] facing." (Doc. 1, pp. 29, 31.)  The Complaint indicates that several Board Defendants already had concerns about race being a factor.  (Id. at pp. 23, 44.)  There is no indication at this stage of the case that the RCC Board based its decision to terminate Plaintiff on anything other than Butler's recommendation, which appears (from the face of the Complaint) to have at least plausibly been premised upon the unspecified community partners' potential discriminatory animus.  Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) ("[C]ausation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation [of a third party] without independently investigating the complaint against the employee").  In sum, while the RCC Defendants did commission an independent investigation into the community partners' complaints, the Complaint plausibly alleges that, in the end, the RCC Defendants[35] followed the investigator's recommendation that it bend to the will of the community partners[36] notwithstanding concerns that some or all of the community partners were acting with racially discriminatory animus.  In light of the foregoing, the Court **DENIES** the RCC's Motion to Dismiss Counts I and II of Plaintiff's Complaint, and **DENIES** Defendants Camacho, Clark, Douglas, Fritz-Tanner,

---

[35]  It cannot be determined, from the face of the Complaint, whether all of the Board Defendants voted to terminate Plaintiff, or—in the event the vote was not unanimous—which Board members voted in favor of termination.  The face of the Complaint makes clear, however, that Board Defendant Booth had resigned from the Board prior to the vote to terminate Plaintiff.  (See doc. 1, p. 24 (allegation in Complaint that Booth resigned on March 27, 2018); id. at p. 29 (alleging that Butler's report was sent to the RCC on April 3, 2018); doc. 57-3, p. 4 (affidavit of Booth confirming that "[b]y the time the RCC Board voted to terminate [Plaintiff's] employment, [Booth] was no longer serving on the Board")).  Accordingly, the Court **GRANTS** Defendant Booth's Motion to Dismiss, (doc. 57), as to Count II.

[36]  The April 2018 letter drafted by Board Defendant Shea on behalf of the RCC supports the theory that the Board Defendants succumbed to the will of community partners, as the letter allegedly reported that "pressure from community partners left [the RCC] 'with no option than to replace the current Executive Director.'"  (Doc. 1, p. 31.)

Hogan, Hughes, Joyner-Barber, Lundy, Roberts, Shea and Wolf's Motions to Dismiss as to Count II of Plaintiff's Complaint.

### B.    Conspiracy Claims (Counts III and IV)

Counts III and IV of Plaintiff's Complaint, which concern an alleged conspiracy amongst some or all of the Defendants, have already been addressed (and dismissed) as to the RCC and the RCC Board Defendants in Discussion Section IV, supra.

### C.    Violation of First Amendment Rights (Counts V and VI)

In Counts V and VI, Plaintiff asserts claims for the violation of her First Amendment rights (pursuant to 42 U.S.C. § 1983) and retaliation against her in violation of her First Amendment rights (pursuant to 42 U.S.C. § 1983), respectively.  Both of these claims are premised on the theory that, after Plaintiff "publicly [spoke] about her concerns surrounding deficiencies in the system that prosecutes sexual assault offenders," Defendants "prohibited [her] from further exercising her First Amendment [r]ights . . . in the manner that she had done at [the] City Council meeting" before ultimately terminating her.  (Doc. 1, pp. 52–54.)

As explained above, in order to state a claim on a civil rights action under 42 U.S.C. § 1983, a plaintiff must show that she was deprived of a federal right (here, her right under the First Amendment) by a person acting under color of state law.  Watkins, 799 F. App'x at 664 (citing Am. Mfrs. Mut. Ins. Co., 526 U.S. at 49–50).  To state a claim for First Amendment retaliation, a plaintiff must allege that she engaged in protected speech, that the official's conduct adversely affected the protected speech, and that a causal connection exists between the speech and the official's retaliatory conduct.  Bailey, 843 F.3d at 480–81.

Plaintiff's First Amendment claims against the RCC and its Board members fail, first and foremost, because none of these Defendants were acting "under color of state law."  As discussed

previously in this Order, (see Discussion Sections III.A(2) and IV.B(2), supra, (addressing and rejecting application of "public function" and "state compulsion" tests to the RCC and the Board Defendants)), there is no indication that the RCC (and therefore its Board) could be deemed a state actor.

Furthermore, there is no indication from the Complaint that the RCC or any of the Board members knew or cared about Plaintiff's comments at the City Council meeting. See Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (as to causation, a plaintiff's allegations "must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action"). Nor is there any allegation that any Board member expressed any concern, reservation, or opinion about Plaintiff speaking out publicly. Notably, while some Board members allegedly made comments about Plaintiff's race and about suspicions that community partners were motivated by racism, there is no allegation that any Board member knew, believed, or suspected that any community partners were upset by, motivated by or otherwise concerned about Plaintiff's public speech, much less the comments she made at the December 2017 City Council meetings. Despite quoting Butler's report at length, Plaintiff's Complaint does not indicate that Butler's report or his email touched at all on Plaintiff's speech-related activities (much less her specific comments at the City Council meetings). As such, there is no indication that his termination recommendation was plausibly linked in any way to Plaintiff's public speech activities. Lastly, there is simply no factual allegation in the Complaint indicating that Plaintiff was told or ordered by anyone affiliated with the RCC to stop speaking publicly or to change or restrict what she said. In sum, Plaintiff has not alleged any causal connection between her speech and the RCC's decision to terminate her.

In light of the foregoing, the Court **DISMISSES** Counts V and VI as to Defendants RCC, Booth,[37] Camacho, Clark, Douglas, Fritz-Tanner, Hogan, Hughes, Joyner-Barber, Lundy, Roberts, Shea and Wolf.

## VI.   Counts VII through X

In the remaining counts—Counts VII through X—Plaintiff seeks various types of relief from the Defendants.  In Count VII, she seeks injunctive and declaratory relief from all Defendants in the form of restoration of her position as executive director of the RCC and a declaratory judgment that she lost her position "as a direct and proximate cause of Defendants' violating her First Amendment rights."  (Doc. 1, p. 54–55.)  In Count VIII, she seeks punitive damages from all Defendants.  (Id. at p. 55.)  In Count IX, she seeks attorney's fees pursuant to 42 U.S.C. § 1988 and Title VII.  (Id.)  Finally, in Count X, she seeks special damages in the amount of $275,000 for back wages.  (Id. at p. 56.)

Having determined that Plaintiff has failed to state any underlying substantive claims against Defendants Ballard, Bryson, Jeffcoat, Libby, Lumpkin, Merriman, Revenew, Heap, Furey, Grant-Robinson, and Booth, and there being no indication or allegation that those Defendants would have the authority to restore Plaintiff's employment with the RCC should she be entitled to such injunctive relief, the Court **DISMISSES** Plaintiff's claim, in Count VII, for injunctive relief from those Defendants.  See Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097–98 (11th Cir. 2004) ("For a traditional injunction to be even theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Fed. R. Civ. P. 12(b)(6) (failure to state a claim).").  The Court likewise **DISMISSES** Plaintiff's request in Count VII for a

---

[37] Counts V and VI against Booth are also subject to dismissal for the same reasons discussed in footnote 34, supra, regarding dismissal of Count II against Booth—she was no longer on the Board when Plaintiff was terminated.

declaratory judgment that her First Amendment rights were violated by these Defendants, particularly as the Court has dismissed, for failure to state a claim, Plaintiff's First Amendment claims against all Defendants.  Finally, the Court **DISMISSES** Counts VIII, IX and X for punitive damages, attorney's fees, and special damages, respectively, as to Defendants Ballard, Bryson, Jeffcoat, Libby, Lumpkin, Merriman, Revenew, Heap, Furey, Grant-Robinson and Booth as there are no surviving substantive claims against them.

Turning to the rest of the Defendants, both Counts I and II remain pending against the RCC and Count II remains pending against Board Defendants Camacho, Clark, Douglas, Fritz-Tanner, Hogan, Hughes, Joyner-Barber, Lundy, Roberts, Shea and Wolf.  In their briefing in support of their Motions to Dismiss, these Defendants' only argument for the dismissal of Plaintiff's request for injunctive relief is that she is not entitled to a *preliminary* injunction because she cannot not show a substantial chance of likelihood on the merits.  (See doc. 55, pp. 21–22; doc. 56-1, pp. 23–24; doc. 57-1, pp. 23–24; doc. 58-1, pp. 23–24; doc. 59-1, pp. 23–24; doc. 60-1, pp. 23–24; doc. 61-1, pp. 23–24; doc. 62-1, pp. 23–24; doc. 63-1, pp. 23–24; doc. 64-1, pp. 23–24; doc. 65-1, pp. 23–24; doc. 66-1, pp. 23–24; doc. 67-1, pp. 23–24.)  Plaintiff has not requested a preliminary injunction and this argument is *non sequitur* with regard to a Rule 12(b)(6) motion to dismiss her claim for injunctive relief.  As these Defendants did not provide the Court with any other basis for dismissal of the injunctive relief request, the Court declines to dismiss that part of Count VII as to Defendants Camacho, Clark, Douglas, Fritz-Tanner, Hogan, Hughes, Joyner-Barber, Lundy, Roberts, Shea, Wolf and the RCC.  However, Plaintiff's other request in Count VII—for a declaratory judgment "that she lost her subject employment position as a direct and proximate cause of Defendants' violating her First Amendment rights," (doc. 1, p. 55)—cannot survive because the Court has dismissed all of Plaintiff's First Amendment claims.  As a result, the Court

**DISMISSES** Plaintiff's request in Count VII for a declaratory judgment against Defendants Camacho, Clark, Douglas, Fritz-Tanner, Hogan, Hughes, Joyner-Barber, Lundy, Roberts, Shea, Wolf and the RCC.

As to the claims for punitive damages (Count VIII), attorney's fees pursuant to 42 U.S.C. §§ 1988, 2000e-5 (Count IX), and special damages (Count X), the only argument these Defendants presented was that these claims could not survive if the Court dismissed all of Plaintiff's substantive claims. Because substantive claims remain pending against these Defendants, this argument does not carry the day. As these Defendants have not presented any other reasons the claims asserted against them in Counts VIII through X should be dismissed, the Court **DENIES** Defendants Camacho, Clark, Douglas, Fritz-Tanner, Hogan, Hughes, Joyner-Barber, Lundy, Roberts, Shea, Wolf and the RCC's Motions to Dismiss as to the injunctive relief request in Count VI, and all requests in Counts VIII through X.

## **CONCLUSION**

For the foregoing reasons, the Court disposes of the pending motions as follows:[38]

- The Court **DENIES** the Motion to Strike filed by the RCC and the Board Defendants, (doc. 54).

- The Court **GRANTS** the Motions to Dismiss filed by Defendants Wendy Furey, Gilbert Ballard, Robert Bryson, A. Blair Jeffcoat, Joseph H. Lumpkin, Sr., Matthew Libby, Mark Revenew, Meg Heap, Rose Grant-Robinson, and Robert Merriman, (docs. 27, 30, 41, 45, 85, 92), as to all claims asserted against each of them.[39]

---

[38] Plaintiff has not filed a motion or otherwise requested leave to amend her Complaint. (See docs. 48, 69, 94, 97.) "A district court is not required to grant a plaintiff leave to amend his complaint *sua sponte* when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542 (11th Cir. 2002) (en banc); see also Carruth, 942 F.3d at 1063 n.3 (11th Cir. 2019) (district court's dismissal of plaintiff's claims with prejudice and *sua sponte* denial of leave to amend complaint was not error because "[plaintiff]—who at all times was represented by counsel—did not move to amend his complaint or suggest to the district court how he would do so") (citing Wagner, 314 F.3d at 542).

[39] All claims against Defendants Cheryl Branch and Cheryl Rogers, who did not file motions to dismiss, remain pending.

- The Court **GRANTS** the Motion to Dismiss filed by Defendant Heather Booth, (doc. 57), as to all claims asserted against her.

- The Court **GRANTS in part and DENIES in part** the Motion to Dismiss filed by the Rape Crisis Center, (doc. 55). Specifically, the Court **GRANTS** the Motion to Dismiss as to Counts III, IV, V, and VI and as to Count VII's request for a declaratory judgment, but **DENIES** the Motion as to Counts I, II, VIII, IX, and X, and as to the request for injunctive relief in Count VII.

- The Court **GRANTS in part and DENIES in part** the Motions to Dismiss filed by Defendants Lynne Wolf, Deena Camacho, Sandra Clark, Pat Douglas, Kimberly Fritz-Tanner, Joseph Hogan, Mike Hughes, Katie Joyner-Barber, Brett Lundy, Mary Roberts, and Kevin Shea, (docs. 56, 58–67). Specifically, the Court **GRANTS** the Motion to Dismiss as to Counts III, IV, V, and VI, and as to Count VII's request for a declaratory judgment, but **DENIES** the Motion as to Counts II, VIII, IX, and X, and as to the request for injunctive relief in Count VII.

The Court **DIRECTS** the Clerk of Court to **TERMINATE** Defendants Furey, Ballard, Bryson, Jeffcoat, Lumpkin, Libby, Revenew, Heap, Grant-Robinson, Merriman and Booth from the docket for this case. Additionally, the Court **DIRECTS** the Clerk of Court to **LIFT** the discovery stay imposed in this case and **ORDERS** the remaining parties to conduct a Rule 26(f) conference within **fourteen (14) days** from the filing of this Order and to file a Rule 26(f) Report within **seven (7) days** from the Rule 26(f) conference.[40] Failure to comply with these directives may result in the dismissal of this action or striking of the answer.

**SO ORDERED**, this 29th day of May, 2020.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[40] The Rule 26(f) Report shall conform to the language and format of Judge Baker's Rule 26(f) Report Form located on the Court's website www.gasd.uscourts.gov under "Forms" and "Judge Baker-Instructions and Forms."